UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
GRYPHON DEVELOPMENT LLC,

Plaintiff, **AFFIDAVIT**

-against-

Case No.: 08 CIV 3252 (WCC)

TOWN OF MONROE,

Defendant.
------------------------------X
STATE OF NEW YORK )
)ss.:
COUNTY OF ORANGE )

DONALD WEEKS, being duly sworn, deposes and says:

1. I am a duly elected member of the Town Board of the Town of Monroe. I have been a member of the Town Board continuously since 1977. I make this affidavit of my own personal knowledge.

**WASTE WATER TREATMENT IN THE TOWN OF MONROE**

2. Orange County Sewer District #1 ("OCSD #1") is a county sewer district. The wastewater treatment plant in OCSD #1 is the Harriman Wastewater Treatment Plant ("HTP").

3. A portion of the Town of Monroe is within OCSD #1. Other portions of the Town are within Town sewer districts. Still other portions of the Town are not within any sewer districts at all.

4. Although the municipal central sewer system within the Town is complex, it is not random or haphazard. Rather, it is the result of substantial planning, careful consideration and public approval through sometimes contentious referendums.

5. The Town of Monroe does not have a waste water treatment plant. It sends waste water from the Town's sewer districts to the HTP. The County accepts waste water from the Town under an Intermunicipal Agreement that it made with an entity called the "Moodna Basin Joint Regional Sewerage Board," which was formed by the Town of Monroe along with four other municipalities. The Intermunicipal Agreement governs the amount of sewer capacity available to the Town of Monroe for its sewer districts.

**THE TOWN'S ATTORNEY**

6. In 1977, the Town of Monroe formed the Town's municipal sewer districts. The attorney who represented the Town in formation of its sewer districts was James G. Sweeney, Esq. In fact, Mr. Sweeney was the Town Attorney for the Town of Monroe from January of 1968 through July of 1988.

7. Mr. Sweeney also represented the Town in negotiating the Intermunicipal Agreement under which the Town obtained capacity at the County's HTP. I believe that he counseled the Town Board and gave confidential advice as to the terms and meaning of the Intermunicipal Agreement, as well as the Town's rights and responsibilities under it.

8. Further, Mr. Sweeney counseled the Town Board regarding outside user agreements to provide sewer service to individual Town residents with property outside of the sewer district. In the

course of representing the Town in entering into numerous outside user agreements Mr. Sweeney frequently provided confidential advice and counsel to the Town regarding policy and procedure on outside user agreements.

**LACK OF SEWER CAPACITY IN THE TOWN OF MONROE**

9. In or about August of 2004, the Town determined that it was using nearly all of the sewer capacity allocated to it under the Intermunicipal Agreement. The Town further determined that proposed new development of lands within the Town's sewer districts would create a demand for sewer service that would exhaust the small remainder of the sewer capacity allocated to the Town. Also, increased effluent flow from the Town of Chester and the Town of Monroe through local lines raised concerns over the ability of the local infrastructure to handle additional effluent. Accordingly, in August of 2004, the Town Board adopted a policy under which it would no longer enter into any outside user agreements until additional sewer capacity was obtained and the local infrastructure was evaluated and/or improved. The Town has not entered any outside user agreements since that time.

10. In or about 2006, Orange County expanded the HTP. The Town informed the County that it wished to obtain an additional allocation of the expanded sewer capacity in the HTP. In January of 2007, the County contacted the Moodna Basin Joint Regional

Sewerage Board and offered to amend the Intermunicipal Agreement to sell additional allocations of sewer capacity to the participating municipalities, including the Town of Monroe.

11. In March of 2007, the Village of Kiryas Joel and others commenced a lawsuit against Orange County seeking a declaratory judgment and injunctive relief preventing the County from selling any of the additional capacity in the HTP. The suit is currently pending in New York State Supreme Court.

**GRYPHON'S REQUEST FOR SEWER SERVICE**

12. Upon information and belief, plaintiff, Gryphon Development, LLC, ("Gryphon") owns approximately five acres of vacant land in the Town of Monroe. Gryphon wishes to develop its land as a seven lot residential subdivision. Although Gryphon's land is not located in a municipal sewer district, Gryphon proposed to provide central sewer service to the new homes through hooking-in to the Town's municipal sewer system.

13. In October of 2004, Gryphon approached the Town and requested to enter into an outside user agreement for provision of sewer service to its property. However, pursuant to the Town's aforesaid policy regarding outsider users, the Town refused Gryphon's request.

14. In September of 2006, Gryphon submitted a petition to the Town asking that the Town's sewer district be enlarged to include

its property. Upon information and belief, Gryphon had heard of the expansion of the County's waste water treatment plant, and hoped that the Town would be obtaining additional sewer capacity from the County as a result of it.

15. On March 5, 2007, a public hearing was held on Gryphon's petition to enlarge the Town's sewer district. A copy of the transcript of the hearing is attached as Exhibit "A." During the course of the hearing, Gryphon admitted that the Town did not presently have any sewer capacity available beyond the capacity needed to serve the needs of properties within the sewer district. (Tr. at p. "17" - "18"). However, Gryphon suggested that additional capacity could be obtained from the County. It was pointed out that a lawsuit had been commenced challenging the County's ability to sell sewer capacity, and that until the Town actually obtained additional sewer capacity, the petition to expand the district would have to be denied. (Tr. at p. "18" - "22"). At the end of the public hearing, the Town Board reserved decision on Gryphon's petition pending the outcome of the aforesaid lawsuit brought against the County.

16. As noted above, the lawsuit against the County is still pending. Apparently, Gryphon grew tired of waiting for a resolution of the suit against the County, and decided to commence

this lawsuit against the Town. The Town Board then adopted the resolution attached as Exhibit "B" denying Gryphon's petition to enlarge the Town's sewer district.

**GRYPHON'S LAWSUIT.**

17. Gryphon's complaint seeks to recover money damages from the Town based upon alleged violation of Gryphon's right to Equal Protection. Gryphon claims that by declining to grant its request to become an outside user or to expand the Town's sewer district the Town intentionally and irrationally treated Gryphon differently than other out-of-district applicants for sewer service. Gryphon's claim is without merit but, equally important, it is improper for Gryphon's attorney, James G. Sweeney, to represent Gryphon against the Town on such a claim.

18. Gryphon's complaint alleges that:

> 21. Between the formation of the District in September 1977 and August 2004 the Town has, upon the request of various property owners, extended sewer service via the facilities of the District, as well as Sewer District No. 9 around Mombasha Lake, to numerous properties not in those Town districts but within the water and drainage sheds of both lakes by way of outside user agreements and outside user permits as contemplated by NY TL §198[1](f).
>
> 22. On information and belief the number of such outside user agreements and permits for sewer service in the Town are approximately 50.

23. The factual circumstances surrounding the extension of the districts' sewer service to the outside users were as follows:

(1) those properties were within the water and drainage sheds of the two reservoirs;

**(2) those properties had been left out of the original boundaries of the districts either by inadvertence or oversight by the Town when the districts were originally formed,**

(3) those properties were extended sewer service by the Town in order to reduce or eliminate the potential of sewage infiltration into the waters of the two reservoirs by way of septic systems leachate,

(4) those landowners paid all capital costs needed to make the connection to the same, and (5) those landowners were obligated by the said agreements to pay the same costs for sewer service as properties in the districts.

[Emphasis added].

19. The complaint also alleges that Gryphon's property met all of the foregoing criteria for becoming an outsider user of the Town's sewer district. Of particular significance, the complaint alleges:

**12. Because of simple inadvertence by the Town Board in 1977 the [Gryphon property] and other lands around that tract also located in the water and drainage shed of Walton Lake were not included within the bounds of the District when it was formed.**

20. Clearly, one of the key allegations in Gryphon's equal protection claim is that the sewer district boundary lines were erroneously drawn to "inadvertently omit" Gryphon's property from the sewer district. The Town denies this allegation and in defending this suit will undertake to prove that Gryphon's property was not "inadvertently omitted" from the sewer district.

21. James G. Sweeney was the attorney who represented the Town Board in 1977 in drawing the allegedly erroneous sewer district lines. The issues in this lawsuit are substantially related to his prior representation of the Town. Certainly, he was privy to confidential or privileged information regarding the Town Board's intentions in drawing the sewer district lines.

22. Further, Mr. Sweeney represented the Town in negotiation and drafting of the outside user agreements from 1977 through 1988. These are the very same outside user agreements referenced in the complaint as demonstrating that the Town Board irrationally discriminated against Gryphon. Of course, the Town will want to distinguish these prior outside user applicants from Gryphon, and the facts surrounding them will be an issue in this case. Again, this is an issue substantially related to Mr. Sweeney's prior representation of the Town and he has or may have confidential information

regarding the said prior applications for outside user agreements.

23.   Moreover, in this litigation the Town will contest the criteria for grant of outside user agreements as alleged in the complaint.   Mr. Sweeney represented the Town Board in formulating the said criteria.   This constitutes yet another issue in the case substantially related to Mr. Sweeney's prior representation of the Town and upon which he has or may have confidential information.

24.   Lastly, a substantial issue in Gryphon's suit is whether the Town had sufficient sewer capacity to serve the needs of properties within the sewer district.   The Town's sewer capacity is wholly dependent upon its rights under the Intermunicipal Agreement with the County.   Mr. Sweeney represented the Town in negotiating and entering the Intermunicipal Agreement.   Although the Intermunicipal Agreement has been amended from time to time after Mr. Sweeney ceased representing the Town, there is, at the very least, an appearance of impropriety in Mr. Sweeney representing a plaintiff in a suit challenging the Town's reading, understanding, rights and responsibilities under an agreement which he negotiated for the Town and upon which he provided confidential legal advice and counsel to the Town.

Donald Weeks

DONALD WEEKS

Sworn to before me this
15th day of August, 2008.

Notary

STEPHEN J. GABA
Notary Public, State Of New York
No. 02GA4975976
Qualified In Orange County
Commission Expires 12/26/2010

# EXHIBIT A

TOWN BOARD: TOWN OF MONROE
MONROE, NEW YORK

----------------------------------------------------------x

Matter of the Public Hearing regarding
On a Petition from

GRYPHON DEVELOPMENT to

Extend SEWER DISTRICT NUMBER 8.

----------------------------------------------------------x

March 5, 2007
Senior Citizen Center
Monroe, New York

B E F O R E:

PETER MARTIN — Acting Supervisor

DONALD F. WEEKS
JAMES ROGERS
HARLEY E. DOLES

ROY MONTANYE — Highway Superintendent
AL FUSCO — Engineer
KEVIN DOWD, ESQ. — Attorney

Robert J. Cummings, Jr. RPR
Court Reporter

(Whereupon, the meeting was called to order at 7:31 p.m.)

ACTING SUPERVISOR MARTIN: Good evening, everyone. Welcome to the Town Board meeting, Monday, March 5th.

Can we all rise for the Pledge of Allegiance.

(Whereupon, the Pledge of Allegiance was recited.)

ACTING SUPERVISOR MARTIN: The beginning of this evening's meeting we have a public hearing on a petition to extend Sewer District Number 8.

I think without any further wait, we will give Mr. Sweeney the floor to explain this to us.

MR. SWEENEY: Good evening. Thank you for scheduling the matter, finally getting the matter underway.

Before I open my comments I would like to pass out a synopsis of the larger map that you see on the easel. I will explain that.

This is an application by the owner of the property you see on the diagram to my left, Gryphon Properties, for an extension of the Town of Monroe sewer district, Sewer District Number 8.

*-PROCEEDINGS-*

Let me go back into some time frames and some history so that I can put this in perspective. And I am going to be a little bit detailed because it is an important set of historical chronology that I want to cover, because I think it reveals quite a bit, and it's important for you folks to understand that, because there is not too many people around here who were around when this whole process began way back when.

Let me introduce myself to you so that you can know who I am and that I speak with some degree of knowledge of the facts that I am going to recite to you.

As I told you earlier, my name is Jim Sweeney and I am here on behalf of Gryphon Development. And in that capacity I am going to explain these facts to you and I can do that only by explaining to you where I came from and how I got to this point at this podium tonight.

Between 1968 in January, actually, January of 1968 and July of 1988 I served as your Town Attorney. Between April of 1978 and October of 1989 I served as Orange County Attorney. In that

capacity I authored the original petition that formed the sewer district, Orange County Sewer District Number 1. I negotiated the original Moodna Basin contract in 1978 with the participating municipalities. I oversaw the formation of Sewer District Number 8. And I negotiated many of the original out-of-contract user contracts for Sewer District Number 8 between individual homeowners and the Town of Monroe.

From that background I will tell you these facts: In 1972, the Orange County -- it was the new Orange County legislature, began to investigate the formation of what was known as a Park County Sewer District in the southern Orange County area, particularly in and around the Town and Village of Monroe. And that investigation came about by way of a petition that was signed by the Town Board of the Town of Monroe, the Village Board of the Village of Monroe, and the Village Board of the Village of Harriman.

It came to pass that in 1975 the Orange County legislature did in fact form Orange County Sewer District Number 1, and opened up the first

treatment plant on the site of the current treatment plant, the sewage treatment plant at Harriman, and the original plant was at a 2 million gallon a day capacity, but it had a capability of expansion to 4 million gallons. When it first opened, it was not at 4 million, it was only at 2.

In September of 1977, after a successful referendum, it was a rather contentious and interesting time in September 1977, there was a referendum that was put out by the Town Board of the property owners in and around the Orange County Sewer District fringes, particularly Walton Lake and Mombasha Lake, to see whether or not those homeowners would be interested in participating in some type of sewage treatment collection arrangement for their properties.

The referendum passed and the Town Board then hired Phil Clark Engineers out of Rochester to actually design what amounted to an extension of the Orange County sewer district facilities, but in a rather unique way.

The district boundaries - first I should tell you - was shaped and formed in and around

the drainage basin for Walton Lake and Mombasha Lake. The district became to be known as Town of Monroe Sewer District 8.

As I said, the arrangement was interesting because it was 100% financed by the federal government at that time, because it was known as an innovative project, an innovative design. And that was a rare time in American government when we could get 100% funding for these types of projects.

The actual facilities, the connection facilities for Sewer District Number 8, were built in 1977, 1978. And in 1978 the Harriman sewage treatment plant expanded into the 4 million gallon capacity that I spoke about before. And at that time, about September of 1978, the participating municipalities, because the Town of Woodbury and the Town of Blooming Grove and the Town of Chester and some of the other communities were thinking about it - were beginning to think about how to participate with Orange County in utilizing the facilities of the Orange County Sewer District Number 1, much as the Town of Monroe had formally gone ahead and do

so with Sewer District Number 8.

In '78 they entered into an agreement, those participating municipalities with Orange County, which set up an allocation arrangement whereby each of these communities that were participants with the county had a particular share of the available capacity for the sewage treatment plant. Monroe's share was fixed at 6.5%, I believe it was at 6.5% of the available capacity. And things went along fairly well for about a year, and then the bottom dropped out. And the county, along with the New York State DEC, implemented what turned out to be a 12-year moratorium on the sewage uses, and everything came to a halt between the year 1988 and the year 2000.

In the year 2000 there began to be some feasibility studies put together with regard to the expansion of the sewage treatment plant for another 2 million gallons per day. And it did come to pass that the facilities of Orange County sewer district were in fact designed and expanded to what is now a 6 million gallon a day facility. And I think the plant opened up in its expanded

capacity in the year 2006.

That gives you a background of what's going on. And of the 2006 -- excuse me, of the expanded capacity, the Town of Monroe still has that 6.5% allocation allowability. And what that means, I will explain in a few minutes to you.

But that gives you background of the situation that grew from basically 1972 through to October of 2006.

Now, with that in mind, I want to turn to what we are talking about tonight, so keep that background in mind. We are talking about a piece of property that is located on the immediate outskirts of the Town of Monroe Sewer District Number 8. And it lies in between, or in what I like to call the dead zone - the death valley between Town of Monroe Sewer District Number 8 and Orange County Sewer District Number 1.

I am going to move from the microphone, so you are not going to hear me on the microphone.

The red line, that you have the document you have in front of you is a synopsis of this. The red line on the left of the diagram represents the easterly boundary, northeasterly boundary of

Town of Monroe Sewer District Number 8, and it runs along Walton Terrace, as you see.

The red line off on the right hand side of the diagram represents the westerly boundary of Orange County Sewer District Number 1. And you can see on the diagram in front of you where there is a little green X; that's Bocci's restaurant, to give you some orientation. And you could see highlighted in yellow Cromwell Hill Road, which is not on this one, but on your diagram, coming up slightly below this. This piece of property lies along Walton Terrace. And as I said, I will carry it over. And as I said it immediately abuts the sewer district. Why wasn't this in the sewer district? It's clearly in the drainage basin of Walton Lake. Why wasn't it in the sewage district? Because there was nothing here in those days in 1978 and before that; there were no real properties that were on anybody's drawing board to be brought into the sewer district. Nobody was really terribly concerned, particularly Phil Clark wasn't terribly concerned about running those particular properties in.

So what happened is we had this open dead zone between Orange County Sewer District Number 1 and Town of Monroe Sewer District Number 8 that became -- it was unsewered, even though it was in the drainage basin of Walton Lake, for the most part, and over here slightly in the drainage basin of Round Island Lake.

So, as you see on your diagram, you see that valley, that death valley that's in between. This property is in that death valley zone. Immediately outside of the property the district exists, Walton Terrace has been sewered. The properties along Walton Terrace have been sewered. And you know about that. I don't have to go into that at great length.

The property that my client owns is highlighted in yellow. And it has the potential of being subdivided into seven lots as you see configured on this diagram, but not on your diagram. We have been to the Planning Board with this preliminary proposal, and everybody agrees that this is the best way to do it. This should be in the sewer district. It should be sewered. It's the best way to do it. It should not be on

a septic system arrangement. It really is naturally inclined to be within the sewer system. And it would be advantageous to do that to protect the watershed for Walton Lake.

Mechanically it's a snap to join the district. There is no problem whatsoever to join the district from a mechanical standpoint. It's merely an extension of a pipe, and the pipe going out the service road that would serve the subdivision coming down Walton Terrace and connecting with the interceptor that runs that way (indicating), westerly towards Round Island Lake and runs out that way. So, from a mechanical standpoint, there is no problem with the connection.

The question is capacity. And does the Town of Monroe Sewer District Number 8 have capacity? So, let's look at that.

All right, you have in front of you, or you should have when I filed this petition I presented you with an engineering report from an Edward Makish, who's an engineer in Suffern who prepared the document for you, and I will try to summarize it for you very briefly.

Town of Monroe sewer district has held pretty steady in the uses and the consumption of sewage that it has used over the last many years. In January of 2006, for the year 2005, a report was filed that the town district used about 99,000, maybe 99,400 gallons per day, or 75% of that capacity figure that I talked to you about earlier. And as of October 21st, 2006 which is the last report I was able to put my hands on, the usage was at 101 gallons, 101,000 gallons per day, or about 76% of the capacity that has been allocated to the Town of Monroe over these past many years since the Moodna Basin agreement was put together in 1978. That talks about actual capacity.

What about reserve capacity? And those properties that are on the drawing board and have been earmarked for future usage. And the most obvious one is the Henry Farm, which is 116 mixed dwelling unit project on Lakes Road, which is in the southerly quadrant of the Town of Monroe Sewer District Number 8. It's earmarked to use, and you have reserved 37,000 gallons per day.

Now, if you use that figure and you add it

onto the 101, so forth that I talked to you about, there is an excess, or I should say, it exceeds the 6.5 capacity that the Town of Monroe has been allocating. But that doesn't take into account the additional capacity that comes with the newly opened 6 million gallon facility that's there. And if you look at the new facility which has about a million gallons assigned to the outside users, the Moodna Basin users, and you factor in the 6.5% allocation factor, and you take the Henry Farm and factor that in, there is still left over about 60,000, maybe not quite that much, but 54,000 would be a better figure, 54,000 gallons per day of excess, or reserve capacity. That's with the existing facility, the 6 million gallon facility open.

So, what I am telling you is, and I know that the arrangements, the financial arrangements with that additional capacity at the plant have not yet been finalized. I know you have been negotiating and talking about them. But in fact it is there to be consumed and used. In fact, it was designed to be used for just this purpose amongst yourselves and the other Moodna Basin

participants.

There is some talk about whether or not that capacity should be shifted and shaken in slightly different ways and tweaked this way and that way. But the end result of it is that there will be a significant amount of additional capacity available for this particular project.

This project is minuscule in the big picture. At the lowest estimate it uses 2800 gallons per day of capacity. Excuse me, yeah, 2800 gallons. At the maximum at peek rate flows it uses 5600 gallons per day. So under any scenario with the expanded plant there is plenty reserve capacity, certainly plenty of actual capacity because you are not using your full tilt capacity at this point.

So, there are two factors that I want to bring home to you; the first is that mechanically this is no problem whatsoever to connect. This is not going over the hill and down the dale and creating a difficult scenario in terms of extending the facilities. From a capacity problem, in an actual capacity situation, you have actual capacity. From a reserve capacity

with the newer plant open, you have reserve capacity to accommodate this. So, you take all those factors and put it all together and you use the rules and the regulations that apply to expansions of districts, and Kevin will advise you on this, and particularly the Clubside case and the cases that relate to the Clubside cases, you have very little discretion in terms of that's what this thing is there for, that is what the sewer district is there for. It's there to be used and to be expanded, if it can be expanded capacity-wise, so that the interest of the public, particularly those in and around this area, and particularly the watershed areas for Walton Lake, are protected. That's what this was all put together for.

Is this going to be a free ride? No, of course not, it's not going to be a free ride. My client is going to build whatever is necessary to connect to the facility and will pay whatever the rates are to the facility.

Now, you have in your minds, and I heard you speak before, about out-of-district users and consumers and so forth and you have concerns.

And I think I mentioned in my earlier recitation of the chronology; there are many many out-of-district customers that I don't think many of you have aware of. There are probably close to 20 contracts that were negotiated in and around the Mombasha area for people who are out of the district. And those contracts, I don't know where they are, they are in Town Hall somewhere, but I negotiated them. And then there were some others that you are more contemporaneously are familiar with, that you have extended and have given rights to join the district on a contract basis here and there and everywhere. But there are a significant number of outside users that have taken advantage of the facility.

I, and my client, don't want to be a contract user. We want to be a full fledged member of the sewer district; participate in its benefits and in its obligations just as anyone does, just as the people across Walton Terrace do.

There is absolutely no reason that this shouldn't be considered in the same vein and in the same light as the Walton Terrace people are

considered at this date.

So, that is where I am coming from. And I think you are at a point now that you have got to make a decision - this has been kicking around a long time - and you have got to come to grips with this. And there is really no reason in fact or law that you should be saying no. And you really should be welcoming it because it's something that is beneficial to this area and to this community. You just don't want to see septic systems in that area. You really don't. It's not a good thing, and that's not what this district and this whole sewer system, both county and town, was put together for.

So, there it is. I am asking you to extend the district. Of course you will have to do, if you do that, you will have to do some degree of finding under SEQRA, and take it from there.

Okay. Now I can answer questions or I can sit down and let you folks debate.

ACTING SUPERVISOR MARTIN: I think our attorney has a couple of questions for you.

MR. DOWD: I do, Mr. Martin.

Jim, I just want to make sure that the

record is clear. You are saying that right now if you took the capacity that's available in Sewer District Number 8 and added in the Henry Farms, which is in the district, we would be over-capacity.

MR. SWEENEY: You would be.

MR. DOWD: And what you are resting upon is the fact that we now potentially have additional capacity from the expansion of the plant.

MR. SWEENEY: It's not potential, it's actual.

MR. DOWD: Okay, but you are saying that's provided that we can negotiate with the county to purchase it?

MR. SWEENEY: It's there --

MR. DOWD: Okay.

MR. SWEENEY: -- it's a question of dollars that are to be paid by either you and the other participants. It's there.

MR. DOWD: Okay.

MR. SWEENEY: It's not floating out there in never-never land.

MR. DOWD: But you are, I am sure, aware that there are other properties, vacant

properties within the district that have a right to that capacity when it's available.

MR. SWEENEY: None that are on anybody's drawing board in terms of immediate or even remote potential. You talk -- there are three other large properties that are in this area.

MR. DOWD: Correct.

MR. SWEENEY: You have the Rosemarin property, and what do I call it, the Fuccione property, it's Dutch Hollow Estates up on the top of the hill. That is on the Planning Board's agenda, but has never gone anywhere. In fact, it's not going, it's in the middle of a Federal Court lawsuit. The other property, the Rosemarin property, has not been presented in any way, shape or form.

MR. DOWD: But you understand the position of the Town Board that they are in the district, and if they request, it they are entitled to capacity.

MR. SWEENEY: They are. But at the same time if it's not being used, I think we are entitled to the same. I mean from a standpoint we have 54,000 gallons of excess capacity hanging

out there.

MR. DOWD: That's based upon the additional --

MR. SWEENEY: That's with the additional usage, yes.

MR. DOWD: All right. I don't know if you are aware of this, or my board members are aware of this, but on Thursday afternoon there was a lawsuit commenced in Orange County Supreme Court to have a Temporary Restraining Order, which was not signed --

MR. SWEENEY: It was not signed, no.

MR. DOWD: -- to prevent the county from selling of any further capacity. So we are sort of sitting back and we may actually get involved in that lawsuit, we may have to get involved in that lawsuit as to protect the Moodna communities. But I just want you to understand you are aware of it.

MR. SWEENEY: I am somewhat aware of the lawsuit. I spoke to a few people about it the other day when I heard about it through the rumor mill. And it's a matter between the Village of Kiryas Joel and Orange County. But at this point

there is nobody who said that the excess capacity of that plant may not be sold to the Moodna Basin participants. And that's what it's there for. That's why it was put together for.

MR. DOWD: One of the purposes of that lawsuit is to stop the county from doing this.

MR. SWEENEY: Sure, but I don't think lawsuit has a snowball's chance in hell.

MR. DOWD: I haven't read it yet, so I can't tell you, but from speaking to the County Attorney today, there will be arguments submitted next week, and papers being submitted, and we will see where that goes. But that could potentially stop us from getting additional capacity.

MR. SWEENEY: Well, if some Court says you don't have additional capacity, you don't have additional capacity, but that hasn't happened yet.

MR. DOWD: Okay. So, I don't believe you are going to get a decision out of this board tonight. We will have the comments and the public hearing will be closed, but at this particular stage in time, I don't think this Town

-PROCEEDINGS-

Board has the information available to it.

MR. SWEENEY: Oh, shucks.

MR. DOWD: I just want to make sure that that's on the record.

That's all I have, Mr. Martin.

MR. WEEKS: Kevin, I would like you to explain to everyone the difference what Mr. Sweeney's requesting of being in the district, and not a contract, compared to the contract that we have given out to other people.

MR. DOWD: Well, again, when the district was formed, as Mr. Sweeney outlined in his historical summary here, there are properties that were included in those districts. And those properties are entitled to sewer capacity when they want it and if they want it.

In the past, this Town Board has, again, by Mr. Sweeney's historical knowledge and comments, as well as what we have done previously, we are willing to take problematic properties that were in the lake drainaged areas, and when there is a failing septic system, give them capacity by contract. They are not in the district. They pay a contractual price to get into the district.

And after that they pay every year, as if they were in the district.

About a year and a half about because of potential capacity problems with the Henry Farms project coming to fruition, this board understood that they were at probably their maximum capacity at the time, and therefore basically said there will be no more outside contracts with any other properties for sewer capacity of the Sewer District 8 or 9. And that's where we are today and that's, unfortunately, Mr. Sweeney's client came in after we stopped that when we realized that the capacities were at times getting rather close, and we were waiting also to see what was going to happen with the expansion of the sewer district in Harriman.

Now that that is up and running, there have been some discussions with the county about additional capacity for Monroe Moodna, Sewer District 8 and 9; there is a price tag attached to that, which this could be quite substantial. And now, of course, there is also what occurred on Thursday afternoon with the Village of Kiryas Joel bringing suit to try to stop any further

-PROCEEDINGS-

allocations to the Moodna communities of any of the additional 2 million gallon capacity at the Harriman treatment plant.

So I think that might answer your question, Mr. Weeks.

MR. WEEKS: But, Kevin, what I was trying to get out was: The ones that we have now contracted with that were not in the district, if we run out of capacity, the person in the district that's in the district have a request, we have to disconnect those people. They are only a contract.

MR. DOWD: Well, each of the contracts provide that they could be disconnected. I don't know exactly how realistic that is under Health Department regulations.

MR. WEEKS: Right, right.

MR. DOWD: However, that is in the contract. I suppose that would be the most harsh thing that the Town could do to those who are under contract, especially because some of those have been under contract for many years.

MR. WEEKS: Right.

MR. DOWD: But it is a legal option that the

Town would have.

MR. WEEKS: The concern that I had, Kevin, was when Mr. Sweeney said on the piece that he's talking about today, that he wanted the district to be expanded, and not come under that so-called umbrella, whatever you want to call it, that we ran out of capacity; they also would be asked to be removed.

MR. DOWD: Well, actually, Mr. Sweeney is asking we re-draw the district lines to include his client in the actual district itself so he would be entitled to the capacity. He would not be under contract. He would be in the district.

MR. WEEKS: Well, I would say we would have to take a hard look at all of the other people that are under contract if we are going to change district lines.

MR. DOLES: Excuse me, how many people do we have under contract at present?

MR. WEEKS: I would say right now, Harley, it's got to be at least, Roy, correct me if I am wrong, 40, 50.

MR. SWEENEY: There were 20 almost immediately after the district was formed back in

'78, in and around, as I said around Mombasha Lake area.

MR. WEEKS: Right. You have got to be -- there is quite a few of them. There were older people, younger people want it, the line was right in front of their house, they didn't want to be in the district, they had overflowing sewer, so we let them in.

ACTING SUPERVISOR MARTIN: Right. Are there any other questions from the board at this point? Because we are deviating from the strict process of the public hearing.

So, I would take a motion from the board to close the public hearing.

MR. SWEENEY: Don't you want to hear something from the public?

ACTING SUPERVISOR MARTIN: I am sorry, I am sorry.

MR. SWEENEY: I will take it. You can close it if you want.

ACTING SUPERVISOR MARTIN: I am not thinking. Okay, show of hands?

MALE VOICE: Was there a public notice for this?

ACTING SUPERVISOR MARTIN: Yes, there was.

MALE VOICE: In the newspaper?

THE CLERK: 11 days before.

MR. WEEKS: It was published quite --

MR. DOWD: 11 days ago in the Times Herald Record.

MALE VOICE: It was?

MR. DOWD: Yes.

MALE VOICE: Okay.

ACTING SUPERVISOR MARTIN: Someone in the audience that would care to ask questions?

Jim Cohir.

MR. COHIR: Jim Cohir.

Walton Lake Terrace, is that an extension of Sewer District 8?

MR. WEEKS: No.

MR. COHIR: Where does that sewer come from?

MR. WEEKS: It was always in the district.

MR. COHIR: District 8.

How is it Lake Avenue is not in District 8? The first part of Lake Avenue up to Fitzsimmons, existing homes, they are not in any sewer district, and they are next door?

MR. WEEKS: Are you talking about the new

homes?

MR. COHIR: The old homes. The road I am on Lake Avenue when I come off Lakes Road, the first six homes are not on any district.

MR. WEEKS: No -- yes, that could be true.

MR. COHIR: It's true.

MR. WEEKS: Because what happened back at the time the people that owned those properties zig-zagged it out and didn't want sewer. That was, call it a mistake, whatever you want to do, but we wanted to put the sewers back in and we got to the point if a person wanted it, fine, if they didn't want it. That's why you have all of those zig-zag lines all the way through.

MR. COHIR: How far back on Cromwell Hill does District 8 exist, where are the border lines?

MR. WEEKS: I would say it goes nearby Bocci's to the right and left. The other ones are Orange County 1.

MR. COHIR: Are you sure Walton Lake is not 1.

MR. MONTANYE: Jenna Bow Road.

MR. WEEKS: Wait a minute now, Jenna Bow

Road is Moodna. It's funny in there, Jim, Jenna Bow Road, and then you go over a little bit, it's still Moodna and then Orange County is right there, where Billy Brown lives is Orange County.

MR. COHIR: All right. Yeah, I am in agreement. I think we should -- this property should be in a sewer district. The only problem I have is I am afraid of that interceptor at Round Lake, what problems that's going to create down the road. You are familiar with the interceptor?

MR. WEEKS: Yes.

MR. COHIR: That's the only problem I have. I think this property should be in a sewer district.

ACTING SUPERVISOR MARTIN: Thank you.

Are there other comments from members of the sewer district?

Jim, I know you are not in the sewer district, but if you want to say something.

MR. GULICK: He asked the question about going around Round Lake and the overflowing and all of that good stuff.

MR. WEEKS: That line hasn't overflowed in

15 years since people stopped throwing stuff in the manhole.

MR. GULICK: Excuse me?

MR. WEEKS: Didn't you hear me?

MR. GULICK: No, I didn't.

MR. WEEKS: That line has not overflowed since the people have stopped throwing stuff in the manhole.

MR. GULICK: I think the people there bolted it down.

ACTING SUPERVISOR MARTIN: There was a problem years ago with the Round Lake interceptor, and it was investigated by several engineering firms. And if I am correct, the end of this investigation they did find a blockage in one of the lines, and when that was removed, the problems went away. And there has not been a reported overflowing of that line in recent history that I can recall. Certainly no one has come to this Town Board in the last 10 years and reported any overflows of that particular manhole.

MR. GULICK: Thank you.

ACTING SUPERVISOR MARTIN: Are there any

other comments from the public?

Then hearing no further comments from the public, I would take a motion from the Town Board to close the public hearing.

MR. WEEKS: So move.

MR. ROGERS: Second.

ACTING SUPERVISOR MARTIN: Call the question.

MR. DOLES: Aye.

MR. ROGERS: Aye.

MR. WEEKS: Aye.

ACTING SUPERVISOR MARTIN: Aye.

MR. DOWD: Jim, could we have a copy of the transcript presented to the Town Board?

MR. SWEENEY: Sure.

MR. DOWD: Thank you.

I HEREBY CERTIFY THE FOREGOING TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE WITHIN PROCEEDINGS

ROBERT J. CUMMINGS, JR., RPR
COURT REPORTER

# EXHIBIT B

**RESOLUTION OF THE TOWN BOARD OF THE TOWN OF MONROE DISAPPROVING THE EXTENSION OF SEWER DISTRICT NO. 8 IN THE TOWN TO INCLUDE THE LANDS OF GRYPHON DEVELOPMENT, LLC PURSUANT TO TOWN LAW, SECTION 194.**

**WHEREAS,** a petition dated September 14, 2006 was duly filed in the Office of the Town Clerk of the Town of Monroe on the 2nd day of October, 2006, requesting the extension of Sewer District No. 8 so as to include the Lands of Gryphon Development, LLC; and

**WHEREAS,** the petitioner was requested to prepare and file a map, plan and report of the proposed extension in accordance with the requirements of the Town Law; and

**WHEREAS,** on December 14, 2006, the petitioner filed a map, plan and report with the Office of the Town Clerk; and

**WHEREAS,** the Town Board of the Town of Monroe adopted an Order reciting the description of the boundaries of the proposed extension, the fact that the proposed improvements consist of a sewerage collection system, including septic tanks and other appurtenant structures together with the necessary lands and rights of way therefor to serve the Lands of Kogan that will connect into an existing sewer line that is part of Sewer District No.8 and that the maximum amount to be expended for the improvements by the Town is $0.00; and

**WHEREAS,** on March 5, 2007, the Town Board held a public hearing on the petition after copies of said Order were duly published and posted according to law; and

**WHEREAS,** at the public hearing, the petitioner's attorney stated that the petitioner's property could be subdivided into 7 residential lots that would produce an average daily flow of 2,800 gpd and a maximum daily flow of 5,600 gpd; and

**WHEREAS,** at the public hearing, the petitioner's attorney reported that the Town has a total allocation of 133,000 gpd available to it in the County's wastewater treatment plant pursuant to a 1988 agreement with the County and that as of December, 2005, the Town was using approximately 99,000 gpd or 75% of its available capacity and as of October, 2006, the Town's average use was approximately 101,000 gpd or 76% of its available capacity; and

**WHEREAS,** at the public hearing and within the petitioner's plan and report, it was conceded that there were other properties within the existing boundaries of Sewer District No. 8 that were not yet hooked up to sewer but were otherwise legally entitled to such service, including the Henry Farms project that requires an average daily flow of 37,080 gpd and which is presently seeking final Planning Board approval; and

**WHEREAS,** after the public hearing, the Town Board initially reserved decision to receive a copy of the transcript of the hearing from the petitioner and to consider the matters presented by the petitioner; and

**WHEREAS,** subsequently, the Town Attorney and the petitioner's attorney agreed that the Town Board would reserve its decision in order for the Town to investigate the feasibility of acquiring additional sewer capacity from the County in its new, expanded sewer treatment plant; and

**WHEREAS,** the Town's ability to acquire additional capacity from the County was further complicated by the initiation of a lawsuit filed by the Village of Kiryas Joel against the County to prevent it from selling any additional capacity to the Town of Monroe and other communities located outside of the County Sewer District, which litigation continues to the present time; and

**WHEREAS,** the Town Board believes that it can no longer keep a decision on the petition in abeyance and, therefore, wishes to render its decision.

**NOW, THEREFORE, it is**

**RESOLVED,** that the petition for the extension of Sewer District No. 8 to include the Lands of Gryphon Development, LLC is (a) signed and acknowledged as required by law and is otherwise sufficient, (b) that all the property and property owners within the proposed extension of the district are benefited thereby and (c) that all the property and property owners benefited are included within the limits of the proposed extension of the district; and it is

**FURTHER RESOLVED,** that it is not within the public interest to grant in whole or in part the relief sought. The reasons for this determination is as follows: 1) The records of the Town indicate that at the time of the formation of Sewer District No. 8 in 1977, the Town retained the services of a consulting engineer to study the feasibility of connecting areas of the Town to the County's sewer treatment plan and to prepare a map, plan and report of how to accomplish the same. Said map, plan and report indicates that the petitioner's property was never to be included within the proposed district. 2) The 1978 Agreement with the County and the 1988 amendment to that Agreement provided the Town with a limited allocation in the County's sewer plant and that allocation was intended to service the properties located within Sewer District No.8, each of which have paid and continue to pay for a portion of the capital improvements and operation and maintenance of the District and the County's plant. 3) As presented by the petitioner's attorney, the Town is using approximately 76% of its allocated capacity in the County plant but there are several large parcels within the existing boundaries of Sewer District No. 8 that are either before the Town Planning Board or are as yet undeveloped that are legally entitled to the capacity allocated to the Town of Monroe. The Henry Farms project, which the petitioner's attorney also represents, requires, by the petitioner's own

submittal, over 37,000 gpd which would immediately use up any remaining allocation the Town has in the County plant and would, in fact, put it some 5,000 gpd over its allocation. 4) The Town has explored with the County the possibility of acquiring additional allocation in the expanded County plant in the range of 50,000 gpd to 70,000 gpd. Unfortunately, several factors have complicated this possibility including the projected cost of acquiring the same. Initial discussions with the County have indicated that the cost may be prohibitive and would put an extreme financial burden upon the property owners within the Sewer District for years to come. Another major roadblock to acquiring the additional allocation is a lawsuit filed by the Village of Kiryas Joel against the County to prevent the County from selling the capacity in the expanded plant to Monroe and other communities in the County. That lawsuit is mired in the State courts and there is no way of knowing what its outcome will be. 5) The petitioner's request for capacity would require the Town to give away capacity that it is reserving for projects like the Henry Farms with the result that it would expose the Town and the District to liability and claims for damages from those property owners who have been in the District since its inception and who have been paying capital charges since 1977. 6) The petitioner purchased the property knowing that it was not within the boundaries of Sewer District No. 8 and it can reasonably develop the property without central sewers but with less lots than the 7 projected if it had central sewers.

**FURTHER RESOLVED,** the petition to extend the boundaries of Sewer District No. 8 to include the Lands of Gryphon Development LLC is hereby denied without prejudice to re-petition the Town Board should the Town acquire additional allocation from the County sometime in the future.

**FURTHER RESOLVED,** that copies of this Resolution shall be filed in the Town Clerk's Office and sent to the petitioner.

Upon motion made by Councilman ___________________, seconded by Councilman _______________, the motion was approved by a vote of ___ ayes and ___ nays with ____ abstentions.

Dated : Monroe, NY
May 19, 2008