UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X

GRYPHON DEVELOPMENT LLC,

                Plaintiff,

- against -

TOWN OF MONROE,

                Defendant.
———————————————————————X

AFFIDAVIT OF
JAMES G. SWEENEY
IN OPPOSITION TO
MOTION TO DISQUALIFY

08 CV 3252 (WCC)

ECF CASE

State of New York
County of Orange: ss

       James G. Sweeney being duly sworn and deposed states as follows:

       1. I am the attorney for the Plaintiff Gryphon Development LLC ("Gryphon") and I submit this affidavit in opposition to the Defendant Town of Monroe's ("the Town" or "Town Board") motion to disqualify me as Gryphon's attorney.

### A SUMMARY OF THE RELIEF SOUGHT IN THIS ACTION

       2. This is a 42 USC §1983 action. Gryphon, as a "class of one"[1], claims a denial of its equal protection guarantees. Gryphon is a real estate developer. It is the owner of a small 6± acre parcel lying adjacent to the Town's sewer district. Gryphon alleges that the Town arbitrarily and without a rational basis denied its petition to expand the District to

---

[1] *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) and *Engquist v. Oregon Department of Agriculture*, - U.S. -, 2008 WL 2329768 (2008).

1

include its parcel when, under circumstances that were identical in all relevant circumstances, the Town has extended sewer service to equally situated parcels of land.

3. As a result of that denial Gryphon claims it cannot develop its land in any feasible way because of because of poor soils and wetlands that inhibit the construction of on site septic systems and that it has lost the opportunity to develop and market its lands all at a substantial monetary loss to it.

4. In terms of the action's procedural posture a second amended complaint has been filed and served and an Answer to that complaint has been filed. No discovery at all has taken place.

## YOUR DEPONENT'S SOURCE OF KNOWLEDGE

5. Since this motion is an attack on me personally I will personalize the following facts and use the pronouns "I" and "my". The source of my knowledge of the facts stated in this affidavit is personal - very personal.

## YOUR DEPONENT'S BACKGROUND

6. After graduating from Fordham Law School in June 1966 and successfully passing the New York Bar Exam I was admitted to the bar of New York in January 1967. I thereupon migrated with my young family to Monroe in Orange County, NY, where I have resided ever since. I was admitted to the bar of this Court in April 1968, to the bar of the Second Circuit in 1969 and to the bar of the United States Supreme Court in 1973.

7. I started my career as an attorney as an associate with Frederick F. Gessner of Monroe, NY, a former Supervisor and attorney for the Town of Monroe.

8. Since I was admitted I have served as general and special counsel to towns, villages, cities, counties, county legislative bodies and school districts. I also served as the Orange County Attorney for over 11 years. Ironically, in terms of this motion I served as a member of the grievance committee for the Ninth Judicial District of New York for eight years. In my forty-one years of practice as an attorney only one other time have I been the subject of an attempt to separate me from my client.[2]

9. In January 1968, I was retained by the Monroe Town Board as the attorney representing the interests of that board as meant by NY TL §20[2](b). I was not retained as a "Town Attorney" as meant by NY TL §20[2](a). I have never been an employee or officer of the Town. Between 1968 and 1988 I also conducted a private practice in Monroe.

10. In my representation of the Town Board I responded to the Board on a case by case, item by item basis as requested by the Board or the Town Supervisor speaking for the Board.

11. My retention as attorney or counsel to the Monroe Town Board was renewed on a semi-annual basis over 20 years. I resigned my position as counsel to the Town Board, with the Board's consent on June 30, 1988.

12. In my role as counsel to the Town Board I advised on a host of municipal matters and affairs and represented the Town Board in many pieces of litigation in both the state and federal courts. Included in those tasks was advice with regard to the formation of

---

[2]That time was by this same Town by these same attorneys in a state court zoning dispute (*Bergstol v. Town of Monroe*, Orange County, NY Index No. 1300/01) in which the NY Supreme Court rejected the attempt.

3

several water and sewer districts in the Town as provided for in both NY TL Article 12 (by petition) and Article 12A (by Town Board resolution subject to permissive referendum).

### THE FORMATION OF SEWER DISTRICT No. 8

13. In a rare display of inter-municipal cooperation, occasioned by horrendous soil conditions in the Monroe area and ever failing septic systems causing a serious health hazard, the Town Board of the Town and the Village Board of Trustees of the Village of Monroe petitioned the Orange County Legislature in 1973 to form a part county sewer district under the provisions of NY CL Article 5-A. I drew the petition to the County seeking that relief.

14. The County Legislature responded affirmatively and, in due course, formed Orange County Sewer District No. 1 including the Villages of Monroe and Harriman and a large part of the Town of Monroe. Thereupon the financial and technical resources of Orange County came into play to carry out a major advancement for this area of Orange County.

15. It came to pass that Orange County completed the necessary implementation studies and construction plans for the District and it became operational a few years later with the opening of the County Sewerage Treatment Plant ("STP") located in Harriman, NY.

16. Little by little the collection system for the County District was extended outward from the STP. In two or three years it reached the outer fringes of the District.

17. At about the same time the federal government began to offer 100% financing in the form of federal grants for "innovative" sewage waste collection technology. The Town of Monroe along with several other municipalities surrounding Orange County Sewer District No. 1 began to investigate the possibility of banding together and using the

facilities of the County Sewer District to service additional sub performing areas in their respective communities and, at the same time, take advantage of the 100% federal grants for "innovative" technology in this respect.

18. In 1975-6 an engineering group from Rochester, NY, known as Clark Engineers put together a consortium of these municipalities consisting of the Towns of Monroe, Chester, Woodbury, Blooming Grove, and the Village of Chester for purposes of studying the possibility of utilizing the Orange County's STP with and what was considered by the federal government as an innovative sewage collection system and taking advantage of the generous federal grants for building such a system. This group of municipalities became known as "the Moodna Basin Group" named after the drainage basin in which they were located, i.e. the Moodna Creek drainage basin in southern Orange County.

19. In 1977 the Monroe Town Board, concerned with protecting the waters of Walton Lake, a reservoir for the Village of Chester, with the assistance of Clark Engineering, formed Town Sewer District No. 8 (Walton Lake) which, generally speaking, included the lands in the water and drainage sheds of that lake, lands that had not been included in the County District.

20. I had nothing to do with the selection of the boundaries for the District. That was the task of Clark Engineering who prepared the maps and plans necessary for the formation of the district pursuant to NY TL §209-c.

21. The District was formed pursuant to the provisions of NY TL Article 12A and was the subject of a referendum of the district property owners. The Town Board adopted

its final order forming the district on September 12, 1977 after the voters in the proposed district approved its formation at a special referendum held for that purpose.

22. I advised the Town Board on the legal particulars necessary for the formation of the district under NY TL Article 12A.

23. The bulk of my advice concerned the legal process of the formation of the District and drafting orders and resolutions necessary under Article 12A. I also advised regarding the conduct of the referendum that followed the Board's preliminary order forming the district (NY TL §209(2)) - especially with regard to who was eligible to vote in that referendum as there was much confusion in the law at that time as to who was a proper elector in such a special referendum.

24. I also rendered assistance and advice to the Town Clerk and Assessor in the conduct of the referendum and the compilation of special voter registration rolls for the referendum.

25. It is my memory that all of my advice, except that given to the Town Clerk and Town Assessor with regard to the special registration roll for the referendum - a very complicated affair, was given at open Town Board meetings and not by letters or memoranda to the Board and certainly not in "executive sessions" (NY POL §105) as the NY Open Meetings Law had been recently enacted (1976) with much public and media fanfare and the Board and I were quite mindful of it.

26. In September 1978 the municipalities in the Moodna Basin Group entered into an inter-municipal agreement with Orange County whereby the facilities of its STP were

made available to these municipalities in varying proportions. I assisted in the negotiation of that contract with Orange County and the other municipalities in the Moodna Basin Group.

27. Under that agreement each municipality in the Group agreed to pay its fair share of the use of the STP and to participate in the cost of expanding that facility by an additional two million gallons of treatment capacity in order to accommodate current and anticipated needs.

28. The 1978 agreement was amended in substantial fashion in September 1988 after I had resigned my position with the Town and after the County had expanded the STP by the additional two million gallons per day capacity. The negotiations for the Town in that respect were handled by Henry Christensen - an attorney in Goshen, NY - not me.

29. It is my belief that the service agreement with the County was amended again in 1995 in substantial ways. I have no personal knowledge of that amendment which, I understand, is the current operating agreement between the municipalities in the Moodna Basin Group and Orange County.

30. In turn and in time, the municipalities in the Moodna Basin Group, including Monroe, began to construct sewage collection systems designed to collect liquid sewage only and transport it by gravity to the County's STP. The solid sewage was removed by pumping individual septic tanks and trucking the same to the STP for treatment. This was considered by the federal government as being "innovative" and the cost of constructing these collection systems and purchasing the necessary pumping and trucking equipment was funded 100% by the federal government saving the municipalities million of dollars in construction and initial equipment costs.

31. I assisted the project engineers in the public bidding and contract formalities with the successful bidders for the construction of the collection system in the sewer district. I subsequently represented the Town in litigation involving claims by one of the successful bidders.

32. During this time frame the Town of Monroe also formed Town Sewer District No. 9 around Mombasha Lake, a reservoir for the Village of Monroe for the same reasons it formed Sewer District No. 8. I also advised with regard to the formation of that district.

33. In my role as counsel to the Town Board I was not involved with, nor was I ever asked to be involved with the day to day administration or operation of Sewer District No. 8 after it was formed. Those activities were handled exclusively by the Town Supervisor (John C. DeAngelis) and the Town Engineer (Andrew W. Barone, P.E.) and the Town Engineer to the Town of Chester (Philip Salerno, P.E.) who acted as an administrator for all of the Moodna Basin municipalities. In short, I had absolutely no role in the daily administration of operation of either sewer district.

**THE CURRENT DISPUTE**

34. The current dispute calls into question the administration of Sewer District No. 8 long after I had terminated my relationship with the Town in 1988. It focuses on the Town's extension of sewer service to properties outside that district during the years 2000 to 2004 to properties that were virtually identical to the Gryphon property in terms of size and location (some were just a few feet away from the Gryphon property) and sewer demand, and the denial of sewer service to the Gryphon property in the same time frames.

35. The current dispute is not related to nor is it dependent upon any activity I performed during my role as counsel to the Town Board between January 1968 and June 1988.

36. Simply put, I had nothing to do with the Town Board's decision to extend sewer service between 2000 and 2004 to these comparative properties and its decision of the Town Board to deny sewer service to the Gryphon property under like circumstances. Nothing at all!

## A RESPONSE TO THE WEEKS AFFIDAVIT

37. It is with much sadness that I must respond to the affidavit of Donald F. Weeks that the Town puts forth in support of this motion.

38. I have known Mr. Weeks and his family (his children are roughly the same age as mine and attended the same grade and high schools together) on a very close personal basis since I located in Monroe over 40 years ago. I consider him a dear personal friend and hold him and his friendship in the highest regard. We and our respective families have been through "thick and thin" together over the last 40 years.

39. With regard to the statements in the Weeks affidavit, which were obviously drawn by counsel for the Town in this matter and not Mr. Weeks, I make the following comments:

- Regarding Paragraph 7. Of course, I gave the Town Board advice and counsel regarding the 1978 agreement with the County. I would have been negligent if I didn't. However, that contract is no longer in place having been replaced with a substantial revision in September 1988 negotiated and entered into at a time when I

was no longer attorney for the Town Board.  Indeed, the 1988 revised contract has been amended at least one more time in 1995 and no longer resembles the 1978 contract.  Furthermore, It is my memory that the elements of the 1978 contract dealt with allocations and administrative matters and had nothing to do with the choice by the Town Board to extend service to persons outside of the District or to expand the District, the issues that are at the root of this litigation.

- Regarding Paragraph 8.  The extent of the advice that I gave to the Town Board regarding "outside user" agreements were that the Town Board could, in its discretion, extend capacity to persons outside the District if it so chooses pursuant to NY TL §198[1](f).  That advice was given by me at an open Town Board meeting shortly after the District was formed.  While I reviewed the form of the contracts I did not draw or negotiate them.  The actual contracts were drawn by the project engineer Clark Engineering of Rochester, NY.  My memory tells me that they were mimeographed "cookie cutter" form contracts of one or two pages simply obligating the outside user to pay for service on the same basis as district property owners and advising them that they were subject always to the Town's ability to supply surplus capacity.  The negotiation of these contracts with individual homeowners was done by the one of three persons, (1) Initially by the project engineer, Clark Engineering of Rochester, NY, (2) later by the Town Supervisor, John C. DeAngelis, or (3) still later by the subsequently appointed administrator for the Moodna Basin Group Philip Salerno, P.E. All of the outside user contracts that the Town entered into during my tenure as attorney for the Town Board were associated with Sewer District No. 9 (Mombasha Lake) and

not with Sewer District No. 8 (Walton Lake) the subject matter of this litigation. I have no memory at all of any outside user contracts for Sewer District No. 8 (Walton Lake) during my tenure. Furthermore, all my discussions and comments with the Town Board regarding any outside user contracts were made at open Town Board meetings and there was nothing confidential about them in anyway. Why should there have been? Local governments are public entities and cannot hide behind a cloak of "confidentiality" except in cases of litigation and there was no litigation that involved outside user contracts during my tenure.

• Regarding Paragraph 20. I had utterly nothing to do with drawing the district lines for Sewer District No. 8 (Walton Lake). That task was done entirely by the project engineer Clark Engineering of Rochester, NY. One must ask why would an attorney be involved in the drawing of sewer district lines. I would have been negligent if I had done so as I am not an engineer by training or licence. Long after Clark Engineering had left the scene it became obvious to the Town Board as the years went on during my tenure that the lands in and around the Gryphon property should have been included in the district but for reasons unknown they were not included by Clark Engineering. These observations were made at open Town Board meetings by Town Board members and, as well, the Town Engineer (Andrew Barone, P.E.) and there was nothing "confidential" about them. To repeat, I had nothing to do with drawing the boundaries of the Sewer District.

• Regarding Paragraph 24. Mr. Weeks (really his attorneys speaking for him) admits that the 1978 contract with Orange County has been "amended from time to time" after

I resigned my position as attorney for the Town Board. However, using the words his attorney drafted for him, he accuses me, at the very least, of the improper "appearance of impropriety". As will be seen in the accompanying Memorandum of Law that accusation has no place in a motion to disqualify an attorney in federal court litigation.

## A CONCLUSION

40. It is very difficult to understand the Town's position that I possess confidential information about the inner workings of the Town Board with respect to the dispute that is now before this Court that I can unfairly take advantage of.

41. Although I remain friendly with some of the Town personnel that I literally grew up with in Monroe who are still alive (especially Donald Weeks), I know nothing of the inner workings of the current Town Board and haven't had access to any knowledge of the Town Board since Ronald Reagan was President - a long time ago.

42. There is nothing in the Town's materials submitted in support of this motion that show that there is a "substantial relationship" between the subject matter of this litigation, i.e. a constitutionally errant decision on the part of the Town Board not to expand the District to my client's property after it had done so for others in like situations, and the events that took place 20-30 years ago when I served as attorney for the Town Board - nothing at all!

43. This motion seems to be made for the purposes of delay and disruption and to foreclose Gryphon from exercising its right to have an attorney that it and its officers choose and have confidence in. Admittedly, there are some circumstances that an attorney should be disqualified because of former representation of adverse party but this is not one of them.

44. This motion should be denied. It is so abhorrent that such a denial should be followed by Rule 11 sanctions.

James G. Sweeney

Sworn to before me this
22nd day of August, 2008

Notary Public, State of New York

ARLENE ANDERSON
Notary Public, State of New York
No. 01AN5038939
Qualified in Orange County
Commission Expires February 6, 2011