# United States District Court
# For the Southern District of New York

In the Matter of :

**08 CV 3251 (WCC)**
*ECF CASE*

## GRYPHON DEVELOPMENT LLC,

Plaintiff,

- against -

## TOWN OF MONROE,

Defendant.

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISQUALIFY

JAMES G. SWEENEY, P.C.
*Attorney for Plaintiff*
One Harriman Square
P.O. Box 806
Goshen, NY 10924
(845) 291-1100

JAMES G. SWEENEY
    Of Counsel
August 22, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

QUESTION PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

GRYPHON'S LEGAL ARGUMENT SUMMARIZED  . . . . . . . . . .  3

  1. The Town fails the stringent *Evans* test . . . . . . . . . . . . .  4

      A.    There is no "substantial relationship" between the
            subject matter of Sweeney's prior representation of the
            Town and the issues in the present lawsuit.  . . . .  5

      B.    There Is No "Privileged Information" At Hand Here
        .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

  2. An "appearance of impropriety" will not support
     disqualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

APPENDIX

  *Leber Associates LLC v. The Entertainment Group Fund Inc.,*
  2001 WL 1568780 (SDNY, 2001)

  *Regal Marketing, Inc. v. Sony & Son Produce Corp.,*
  2002 WL 1788026, *7 (SDNY, 2002)

i

# TABLE OF AUTHORITIES

## Federal Cases

*Bennett Silvershein Assc. v. Furman*
776 F. Supp. 800 (SDNY, 1991) . . . . . . . . . . . . . . . . . . . . . . . .  4

*Clubside v. Nosworthy*
468 F.3d 144 (2nd Cir., 2006) . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Engquist v. Oregon Department of Agriculture*
- U.S. -, 2008 WL 2329768 (2008) . . . . . . . . . . . . . . . . . . . . . .  5

*Evans v. Artek Systems Corporation*
715 F.2d 788 (2nd Cir., 1983) . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*In Re: County of Erie*
473 F.3d 413 (2nd Cir., 2007) . . . . . . . . . . . . . . . . . . . . . . . .  11

*In re: Grand Jury Subpoena*
886 F.2d 135 (6th Cir., 1989) . . . . . . . . . . . . . . . . . . . . . . . .  11

*Leber Associates LLC v. The Entertainment Group Fund Inc.*
2001 WL 1568780 (SDNY, 2001) . . . . . . . . . . . . . . . . .  4, 5, 13

*Neilson v. DeAngelis*
409 F.3d 100 (2nd Cir., 2005) . . . . . . . . . . . . . . . . . . . . . . . .  6

*Reed v. Baxter*
134 F.3d 351 (6th Cir., 1998) . . . . . . . . . . . . . . . . . . . . . . . .  10

*Regal Marketing, Inc. v. Sony & Son Produce Corp.*
2002 WL 1788026, *7 (SDNY, 2002) . . . . . . . . . . . . . . . . . . .  5

*United States Football League v. National Football League*
605 F. Supp. 1448, FN 31 (SDNY, 1985) . . . . . . . . . . . . . . . . .  4

*Village of Willowbrook v. Olech*
528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5


## State Cases

*Gernatt Asphalt Products, Inc. v. Town of Sardinia*
87 N.Y.2d 668 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Morgan v. New York DEC*
9 A.D.2d 586 (3d Dept., 2004) . . . . . . . . . . . . . . . . . . . . . . . .  11

*Walden Federal Savings Bank v. Village of Walden*
212 A.D.2d 718 (2nd Dept., 1995) . . . . . . . . . . . . . . . . . . . . .  13


## Other Authorities

New York's Open Meetings Law and NY POL §105 . . . . . . . .  10

NY CPLR §3101(a)(4)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

iii

## QUESTION PRESENTED

The plaintiff's attorney represented the defendant Town Board from 1968 to 1988. In 1977 the Board formed a sewer district with the attorney advising. That relationship ended in 1988. Twenty years later the attorney was retained to pursue an equal protection claim against the board involving its refusal, in 2007, to expand the district to include his client's lands. Is the attorney prevented from representing his client in the action?

1

## STATEMENT OF THE CASE

In 2008 the Monroe Town Board refused to expand Sewer District No. 9 (Walton Lake) to include the Plaintiff's ("Gryphon) adjacent lands. Gryphon claims that the Board, under virtually identical conditions, had done so on several occasions within the last few years. After the refusal Gryphon commenced this "class of one" equal protection action under 42 USC §1983 claiming money damages. The Town Board has answered the Compliant that is as far as the proceedings have progressed to this point. There has been no discovery.

Gryphon's attorney ("Sweeney") represented the Town Board when the District was formed in 1977. He had been its attorney from 1968 to 1988. The Town now claims that Sweeney is precluded by the rules of professional conduct from representing Gryphon because of that prior professional relationship and moves to disqualify him.

The Town claims that Sweeney, in his role as attorney for the Town Board, garnered confidential information with respect to the formation and administration of the sewer district and, in particular, (1) as to why Gryphon's lands were not included, and (2) with respect to the negotiation of a 1978 service contract with Orange County for treatment of sewage collected in the Town's district and transported to the County's Sewage Treatment Plant ("STP") in Harriman, NY.

Sweeney counters that he had nothing to do with the selection of the district boundaries in 1977 and that the 1978 contract has been amended several times in significant ways after he terminated his professional relation with the Town in 1988. He further avers that he had nothing to do with the administration of the district during his tenure and certainly not after that tenure ceased over 20 years ago.

2

Lastly, Sweeney counters that any information he received or gave about the sewer district during his tenure was not confidential as it was given in the *public arena* to a local government and, as such, the material or information does not enjoy an attorney client relationship to begin with. Indeed, the Town, as a local government must, by law, expose its business to the public.

Accordingly, Sweeney argues that the there is no basis for disqualifications under the legal rules that pertain to any attempt to derail an attorney of choice in federal court litigation.

## GRYPHON'S LEGAL ARGUMENT SUMMARIZED

In seeking to disqualify Sweeney because of his prior representation the Town Board has a heavy burden to overcome this Circuit's unfavorable attitude towards such relief in circumstances such as this, i.e. prior representation. The Town must satisfy the so called *Evans* test (*Evans v. Artek Systems Corporation*, 715 F.2d 788 (2nd Cir., 1983) before disqualification can be considered by the Court.

Using the *Evans* test the Board has failed to show by hard and strong evidence that there is a "substantial relationship" between the discrete issues raised in this case, i.e. the unconstitutional denial, on equal protection grounds, of Gryphon's petition be included in the sewer district by using comparisons over the last four years where sewer service was extended by the Board, and the advice given or received by Sweeney while he served as attorney to the Board *over 30 years ago* at a time when the district was formed.

Furthermore, any information or materials the Board now claims are confidential as a result of that representation are not privileged at all under the attorney client privilege to begin with. They are, by virtue of New York law, *public* materials.

3

As such the disqualification motion should be denied.

## 1. The Town fails the stringent *Evans* test

Motions to disqualify attorneys are not favored by the federal courts. Indeed, they are "disfavor[ed]" and the federal courts are "loath" to separate a client from his or her chosen attorney. The party seeking disqualification, here the Town, carries "heavy burden" and must meet a "high standard of proof" before a federal court will disqualify an attorney. See *Bennett Silvershein Assc. v. Furman*, 776 F. Supp. 800, 802 (SDNY, 1991) and *Leber Associates LLC v. The Entertainment Group Fund Inc.*, 2001 WL 1568780 (SDNY, 2001)[1] and cases collected and discussed therein. Generally speaking federal courts are not the policemen of the various codes of professional conduct that govern the performance of attorneys. Such matters are left for the disciplinary arm of the bar. *United States Football League v. National Football League*, 605 F. Supp. 1448, 1463, FN 31 (SDNY, 1985).

The leading case in this Circuit on this topic is *Evans v. Arteck Systems Corporation*, 715 F.2d 788 (2nd Cir., 1983). In *Evans*, after reviewing applicable standards, the Second Circuit sets up a three prong test for adjudicating disqualification motions where the attorney client relationship has been terminated prior to commencements of the current litigation. The three prongs are these:

> • The moving party, here the Town, must be a former client of the adverse party in the current litigation. (Here, admittedly so).

---

[1] Annexed in Appendix hereto.

4

• There must be a "substantial relation" between the subject matter of the attorney's prior representation and the issues raised in the current litigation.

• The attorney sought to be disqualified must have had access to, or was likely to have access to, "privileged information" in the course of his or her prior representation.

The Town's claim fails to satisfy the second and third prong of the *Evans* test.

### A. There is no "substantial relationship" between the subject matter of Sweeney's prior representation of the Town and the issues in the present lawsuit.

The test for just what is a "substantial relationship" is discussed at length in *Leber Associates LLC v. The Entertainment Group,* 2001 WL 1568780, *5 (SDNY, 2001). It is a component of the *Evans* test that is strictly enforced. Indeed, the two matters must be "identical" or "essentially the same" or "intimately related". It is a "stringent standard" intended to work against the ouster of the attorney chosen by the client. See also *Regal Marketing, Inc. v. Sony & Son Produce Corp.,* 2002 WL 1788026, *7 (SDNY, 2002).[2]

The issues in the present lawsuit involve the administration of the sewer district from 2004 on. Gryphon alleges that in 2004 the Town Board granted outside user permits to three out of district properties: (1) the Dierna Lot, (2) the Ajjan Lot, and (3) the Peluso-Trisci Lot and, in 2007 denied Gryphon's petition to formally expand the district to include its lands under circumstances that were virtually identical to those involved when the grant of outside user permits to Dierna,

---

[2]Annexed in Appendix hereto.

5

Ajjan and Peluso-Trici were made, so similar in fact as to preclude the element of mistake. See ¶25 of Gryphon's Complaint read together with ¶¶52 and 53 thereof. Accordingly Gryphon claims that it was denied equal protection of the laws guaranteed to it under the Fourteenth Amendment and seeks redress from this Court as a "class of one". See *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) and *Engquist v. Oregon Department of Agriculture,* - U.S. -, 2008 WL 2329768 (2008) read together with *Clubside v. Nosworthy,* 468 F.3d 144, 158 (2nd Cir., 2006).

In its main Memorandum of Law (at pg. 9) in support of its argument that there is a "substantial relationship" between Sweeney's services as attorney for the Town Board in 1977-78 and the issues in this lawsuit, the Town alludes to the allegations in ¶24 of the Complaint with regard to outside user contracts and permits extended by the during Sweeney's tenure as attorney for the Town Board and complains that Sweeney will be using those situations as comparitors to prove Gryphon's class of one claim. The data recited in ¶24 is of historical import only. Sweeney, at the pre trial conference before the Court held on July 23, 2008 advised the Court of such and agreed that there would be no proof offered by Gryphon of any outside user contracts or permits more than ten years old.[3] That assurance was given to this Court *before* this motion was made and *before* counsel for the Town authored his main Memorandum of Law.

Similarly, in support of its "substantial relationship" argument, the Town argues, at pp. 9 ff. and 14 of its main Memorandum of Law,

---

[3]Indeed, how could there be such proof? To attempt such would run afoul of the rigid constraints placed upon the comparitors test for a class of one equal protection claim. Simply put any such comparison would fail because of the vast time difference involved. See discussions in *Neilson v. DeAngelis,* 409 F.3d 100 (2nd Cir., 2005).

6

that as a critical part of its case Gryphon argues that the Town had an "established policy or practice" of according outside user permits from the time the district became operational in 1978 almost automatically and that Sweeney had a hand in formulating that policy. Accordingly, so goes the Town's argument, Sweeney cannot now use the confidences he gained in establishing that policy to promote his client's interests in this case.

This Court will search Gryphon's complaint high and low for any allegation that the Town had an "established practice or policy" of granting outside user permits on an *ipso facto* basis and that it unfairly violated that established policy when it denied Gryphon's extension petition. Paragraph 23 of the Compliant does allege factual circumstances in which outside user permits were granted over the past years. However it does not allege an "established policy or practice" that Sweeney had any hand in formulating. Gryphon does not rely on any "established policy of practice" of the Town Board. To the contrary Gryphon builds its equal protection case on comparisons to the grant of outside user permits for three properties in the year 2004 that are virtually identical in circumstances (i.e. time, location and capacity demand) to those of Gryphon. Gryphon's equal protection case has utterly nothing to do with any "established practice or policy" of the Town, no less one that Sweeney had anything to do with.

At pp. 10-11 of its main Memorandum of Law the Town claims that Gryphon's case is dependant upon a showing of adequate capacity at the STP "under the terms and provisions of the [1978] intermunicipal agreement". For sure Gryphon must show the fact finder that there was adequate capacity at the STP at the time its petition was denied in 2007 but that fact has nothing to do with the 1978 inter-municipal agreement which, admittedly has been substantially amended at least one, and possibly twice, since Sweeney's tenure ended. Sweeney had nothing to do with those

amendments. At best the allocation formula in the 1978 agreement may have tracked its way through the subsequent amendments but that is certainly not a matter of confidential information. That 1978 contract and all its amendments are "public records" under New York's Freedom of Information Law (NY POL §86[4]) and are discoverable by anyone.

In another context the Town argues in its main memorandum of law, at pp. 14-15, that Sweeney was privy to "confidential deliberations" and reasoning of why the district was formed as it was leaving Gryphon's property on the outside and somehow that also supports a substantial relationship between then and now. That is utter nonsense. The boundaries of the district were publicly proposed by the project engineer Clark Engineering of Rochester, NY, based on geo-physical characteristic and were the subject of a mandatory public hearing (NY TL §209-d) and a subsequent vote of the property owners in the district by way of a mandatory referendum under NY TL Art.12A and were anything but "confidential". They were the subject of extended *public* debate and *public* deliberation by the Town Board and a *public* vote as required by law. The Town's argument assumes that there was some kind of secretive, behind closed doors, Town Board meeting at which the boundaries were determined with Sweeney in attendance and advising. Such, of course, if it happened (which it didn't) would violate the NY Open Meetings Law (NY POL Art. 7) and would be wholly illegal. It was well after the formation of the district that the Town Board came to realize that the lands in and around Gryphon's lands, as they came to be developed, should have been included in the district - but never were. There was nothing secret or confidential about those observation either. They were voiced at various public meetings of the Town Board.

The issues in this lawsuit do not involve the formation of the district, or the reasons why Gryphon's lands were not included when

8

the district was originally formed, or the now amended 1978 inter-municipal agreement with Orange County, or the extension of sewer service to outside users prior to the year Sweeney terminated his professional relation with the Town (1988), or the administration of the district by the Town Board prior to that time. In the best light it is only those areas of interest that would possibly fall within the purview of confidences given or received by Sweeney during his tenure as attorney for the Town Board between 1968 and 1988.

The issues of concern in this lawsuit deal with the administration of the district from 2004 on and pose the discrete question of whether or not the Town Board was constitutionally derelict in awarding outside user permits to the Dierna, Ajjan, and Peluso-Trici properties in 2004 and denying the same sewer service to Gryphon under virtually identical circumstances. That discrete issue was never at hand during Sweeney's tenure. Viewed as such it is difficult, if not impossible, to conclude that there is a "substantial relationship" or overlap between Sweeney's services as attorney for the Town Board from 1968 to 1988 and the discrete issues brought to the fore by this litigation. The issues now before the Court are not "identical" or "essentially the same" or "intimately related" to the matters about the sewer district that were *publicly* discussed during Sweeney's tenure. The effect of the *public* nature of Sweeney's counsel is discussed in the next section.

### B. There Is No "Privileged Information" At Hand Here.

The third requirement of the *Evans* test is that the attorney must have had access to, or was likely to have access to, "privileged information" in the course if his prior representation of the client. That accords with the central theme of the Board's argument that Sweeney gained or gave confidential information regarding the sewer district during his tenure that is protected or "privileged" information to begin with under traditional notions embodied by the

9

attorney client privilege.  Such a contention shines a spotlight upon what, in the context of an attorney representing a public body, is "privileged information".

That privilege, if it exists at all, when applied in the context of an attorney representing a public body rubs up seriously against the public's right to know the business of its government.   "The governmental [attorney-client] privilege stands squarely in conflict with the strong public interest in open and honest government". *Reed v. Baxter,* 134 F.3d 351, 356-357 (6th Cir., 1998).

Aligning itself with this powerful observation New York has adopted a strong public policy in favor of open and honest government.  As a result the relation of an attorney in New York representing a public client is quite different from the ordinary private sector attorney client relationship.   The relationship is constrained by notions of the public's right to hear the deliberations of the public body and to discover public records all as spoken about in *Reed.*  New York's public policy in this respect is set out in NY POL Article 6 (New York's "Freedom of Information Law") enacted by the Legislature in 1974 and Article 7 (New York's "Open Meetings Law") enacted in 1976.

Since the 1978 inter-municipal contract and the outside user contracts are not in an of themselves at issue - they do exist and they are public records available for inspection - the issue of client confidentiality claimed by the Board here can only center around the advice given between Sweeney and the Town Board during the Board's deliberations about the formation and administration of the sewer district during his tenure.[4]

---

[4]As discussed below Councilman Weeks does not point to any writings to or from Sweeney that could have contained confidential information.

10

Generally speaking, in New York the deliberations of a public body cannot be confidential. The public in New York has the right to hear and see the deliberative process of a public body. Such a body cannot claim confidentiality via so called private "executive sessions" except in the most limited of circumstances. See New York's Open Meetings Law and NY POL §105 in particular. Except for the topics listed in Section 105, none of which deal with the formation of a sewer district or the possibility of extending sewer service to properties outside of that district once formed, an attorney for a public body must give his legal advice in open *public* sessions. "The purpose of [New York's] Open Meetings Law is to prevent municipal governments from debating and deciding in private what they are required to debate and decide in public." *Gernatt Asphalt Products, Inc. v. Town of Sardinia,* 87 N.Y.2d 668, 686 (1996). Short of actual litigation there is nothing in Section 105 that would have authorized Sweeney to have given or received legal advice concerning the formation of or the ongoing administration of the sewer district in private or behind closed doors in surreptitious "executive sessions". An attorney for a public body who gives his advice in an illegal, closed door session is not shielded by the privilege. *In re: Grand Jury Subpoena,* 886 F.2d 135, 139 (6th Cir., 1989). There are few "client secrets", as the Town Board so politely calls them (brief pg. 15), in the public sector.

Although the Second Circuit and New York courts have recognized a public sector attorney client privilege (*In Re: County of Erie,* 473 F.3d 413 (2nd Cir., 2007) and *Morgan v. New York DEC,* 9 A.D.2d 586 (3d Dept., 2004)) they have done so in the limited context of written materials and not legal advice given during the deliberative process which, as noted, in New York is, by law, mandated to be open to the public.

Even with regard to writings the Second Circuit has recognized the privilege quite sparingly noting the overarching tension

11

articulated in *Reed* between the client's right to confidentiality and the public's right to know the workings of its government. To be entitled to the privilege as it applies to a writing the public body must show (1) that the claimed confidential information was actually made or given, (2) the information was intended to be and was in fact kept confidential, and (3) it was generated for the purpose of obtaining or receiving legal advice. *In Re: Erie Co.,* id at 473 F.3d 419.

Here, in support of the Town's claim of privilege the Town brings forth only the slim assertions of Councilman Weeks that he "believe[d]" that Sweeney gave confidential advice to the Town Board relative to the 1978 inter-municipal agreement with Orange County. Weeks affidavit ¶7. That is hardly a statement that Sweeney did in fact give such confidential written legal advice.    More importantly, regarding both the 1978 inter-municipal agreement and the outside user agreements there is nothing in Councilman Weeks' materials or any other materials offered by the Town Board that show any such written advice, if it existed at all, was intended to be, and was in fact, confidential.   Indeed, Sweeney retorts that the only advice he gave regarding either the 1978 inter-municipal agreement or the outside user contracts was at open public meetings of the Town Board to be heard by the public as is required by New York law.  Hardly confidential materials.

Gryphon agrees that the actual content of a writing claimed to be confidential need not be revealed on a motion such as this thereby leading to its revelation in any event.  But, at the very least the public body claiming confidentiality over written materials should be required to indicated with some specificity that they actual exist lest the cloak of confidentiality in the public sector be spread over any possible writing even though 30 years later no one can say it actually existed. Noteworthy here is that Sweeney says there were no written materials to the Board regarding his advice about the formation or

12

administration of the sewer district and Councilman Weeks points to none.

Furthermore, if the writings do in fact exist there must be a showing, at the very least, that they were intended to be confidential. There is no such showing here. Indeed, as noted, there is no showing that there were such writings at all. Simply put, in New York the deliberative information that the Board now seeks to cloak with the aura of confidentiality is *public* information and with regard to any written materials the Board fails to reveal the existence of any and the circumstances of their origin.

Beyond that truth there is no hint in the Weeks' materials or anywhere else that Sweeney's advice was given or received in the context of litigation about any aspect of the sewer district (there was none except some contract litigation involving the contractor who built the collection system) and thus is somehow protected as material prepared for litigation under NY CPLR §3101(a)(4)(c).

Thus, at its core the Town's claim that Sweeney was privy to privileged, and thereby confidential "client's secrets" is hollow and should not form the basis for disqualification. The Town has failed the third prong of the *Evans* test.

## 2. An "appearance of impropriety" will not support disqualification.

As a last resort the Town (at pg. 18 ff of its main Memorandum of Law) asserts that Sweeney is guilty of an "appearance of impropriety" and that appearance alone calls for disqualification. The argument of appearance of impropriety, even if true, simply will not support a disqualification. *Leber Associates LLC v. The Entertainment Group, Inc.,* 2001 WL 1568780, *7-8 (SDNY, 2001) and cases discussed thereat.

13

In making this argument the Town lays great weight upon the case of *Walden Federal Savings Bank v. Village of Walden,* 212 A.D.2d 718 (2nd Dept., 1995). In that case the attorney who was disqualified by the court actually drafted the local law that was the subject of the current litigation in which he represented an objector to the law. That is an extreme case that is not present here. While Sweeney had some limited connection to the outside user agreements prior to 1988 and some connection to the subsequently amended 1978 inter-municipal agreement with the County, Gryphon does not object to either. It objects to the unfair decision of the Town Board in administering the district twenty years after Sweeney's tenure was complete, in a way that has nothing to do with the Sweeney's pre 1988 *public* advice to the Town Board concerning the district.

## CONCLUSION

The defendant Town Board is miffed that its former attorney, who ceased his representation of the Board over 20 years ago, is now representing a claimant against it. How dare he, the Town Board argues. That attorney gained and gave confidential information the Board says can now be used against the Town in this lawsuit and, thus, he should be disqualified.

The right of a litigant to select his own attorney is a powerful one that should not be interfered with the by courts unless there is a very real danger that the trial process will be tainted by the confidences that an attorney who once represented the adversary has gained. The courts disfavor disqualification and will not countenance it unless the threat to the judicial process is very real. The party seeking to disqualify an attorney has a very high burden of proof that the judicial process will in fact be tainted if the attorney is allowed to continue.

14

Here, the Town's fit of pique is not supported by an iota of strong and solid proof that its former attorney's representation as its counsel between 1968 and 1988 bares a "substantially relationship" to the discrete issues at hand in this litigation, i.e. the arbitrary and unconstitutional denial of his client's petition to the Board to include its lands in a Town sewer district formed over 30 years ago when the attorney represented the Board.  The Board has not shown that the *public* information that was given and received by the attorney with respect to that sewer district during his tenure is privileged at all.  Indeed, it is *public* material and belongs in the public domain.  The Town has completely failed the two most important parts of the so called *Evans* test.  The motion to disqualify should be denied.

Dated: Goshen, New York
      August 22, 2008

                Respectfully submitted,
                James G. Sweeney, P.C.

                James G. Sweeney
                *Attorney for Plaintiff*
                One Harriman Square
                P.O. Box 806
                Goshen, New York 10924
                Tel. (845) 291-1100

James G. Sweeney
*Of Counsel*

15

# APPENDIX

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

Page 1

**H**

Leber Associates, LLC v. Entertainment Group
Fund, Inc
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LEBER ASSOCIATES, LLC, Plaintiff,

v.

THE ENTERTAINMENT GROUP FUND, INC.,
Creative Entertainment, Inc. and Frank Gelb Pro-
motions Inc., Defendants.
**No. 00CIV.3759(LTS)(MHD).**

Dec. 7, 2001.

Michael L. Shanker, Esq., New York.
Grant R. Cornehls, Esq., Herrick, Feinstein LLP,
New York.
Joseph F. Keenan, Esq., McCanliss & Early, L.L.P.,
New York.

MEMORANDUM & ORDER

DOLINGER, Magistrate J.
**\*1** Plaintiff Leber Associates, LLC has moved for
an order disqualifying the law firm Herrick, Fein-
stein LLC from representing defendants Creative
Entertainment, Inc. ("CEI") and Frank Gelb Promo-
tions Inc. ("FGP"). The stated basis for the motion
is plaintiff's contention that Herrick, Feinstein has
performed legal services, and continues to do so,
for Mr. Steven Leber and his wife. For the reasons
that follow, the motion is denied.

*Background*

This lawsuit was commenced last year by Leber
Associates, LLC to seek compensation for alleged
breaches of the defendants' obligations under sever-
al contracts relating to the production of a concert
in December 1999 featuring Andrea Bocelli. Two
of the defendants-CEI and FGP-were originally rep-
resented by Segal, Goldman, Mazzotta & Siegel,

P.C.. At the end of August of this year, those de-
fendants consented to a change of counsel, with
Herrick, Feinstein being substituted for the Segal,
Goldman firm.

With the close of discovery rapidly approaching,
plaintiff moved by order to show cause dated Octo-
ber 22, 2001 to disqualify Herrick, Feinstein. In
substance, Leber Associates claims that the law
firm has furnished and still provides legal repres-
entation to Mr. Leber and his wife in connection
with a will and living trust prepared on Mr. Leber's
behalf. (Affidavit of Steve Leber in Support of
Plaintiff's Order to Show Cause, sworn to October
19, 2001, at ¶ 5). Plaintiff also suggests that, by vir-
tue of the firm's assistance to Mr. Leber, its lawyers
became familiar with the details of his personal fin-
ances, and may be expected to use that information
to demonstrate that he should be personally liable
to defendants on their counterclaims. (Leber Aff. at
¶¶ 6 & 12; Plaintiff's Memorandum of Law at 6).

In response, Herrick, Feinstein represents that it is
not providing any legal services to Mr. Leber and
his wife, and has not done so since the end of 1997.
(Affidavit of Paul Herman, sworn to October 25,
2001, at ¶ 2 & Ex. A). Conceding that it did assist
Mr. Leber prior to that time in connection with his
will and a living trust and that its advice concerned
the legal treatment of his assets, the firm insists that
he is a former client, and that its attorneys had no
involvement either in the creation of Leber Asso-
ciates or in the transactions that underlie the current
claims and counterclaim. (Herman Aff. at ¶¶ 2 &
3). Defendants also note that the Lebers are not
parties to this lawsuit, and they argue that that fact
alone eliminates any basis for disqualification,
since plaintiff is neither a present nor a former cli-
ent of the firm. (Defendants' Memorandum of Law
at 4).

In the wake of the court's receipt of papers, we con-
ducted oral argument on November 1, 2001, at
which the parties conceded that, whatever its mater-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

iality, the question of whether Mr. Leber is a current or past client of the firm was in dispute. Accordingly, we conducted a brief evidentiary hearing on November 7, 2001 at which Mr. Leber and Peter Herman, Esq., a partner at Herrick, Feinstein, both testified. Mr. Leber repeated his assertion, in general terms, that he had called Mr. Herman from time to time since the end of 1997 for advice on his will and trust, and that he had, in fact, expected to do so again in the near future. He claimed that he was therefore surprised to discover that the firm had chosen to deny him client status. Mr. Herman, in contrast, reported that he and his firm had last performed services for Mr. Leber in 1997. He also cited the absence of any recording of subsequent contacts with Mr. Leber and the lack of any billing for time for such asserted contacts as documentary support for his contention.

## ANALYSIS

**\*2** Plaintiff rests its motion on Canons 4 and 5 and, implicitly, on Canon 9 of the New York Code of Professional Responsibility.FN1(*See* Pltff's Memo at 6). These canons require, respectively, that an attorney protect the confidences of his client, refrain from acting in a manner injurious to the interests of his client and avoid appearances of impropriety.

> FN1. The New York Code is essentially identical to the American Bar Association Model Code of Professional Responsibility promulgated in 1969 and adopted by the New York State Bar Association in 1970. *See* 29 McKinney, N.Y. Judiciary Law, appendix, 350 (1992).

### 1. General Standards

As a general matter, the federal courts have looked to the Code for guidance in evolving standards to govern attorney disqualification motions,FN2 although the courts are not bound by these rules. *See, e.g., Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26 (2d Cir.1980) (*en banc* ), *vac. on other gds.,*449

U.S. 1106 (1981); *Emons Indus. Inc. v. Liberty Mut. Ins. Co.,* 747 F.Supp. 1079, 1082 n. 3 (S.D.N.Y.1990).FN3 The Second Circuit has repeatedly indicated, moreover, that the Code provisions are not to be rigidly applied to force attorney disqualification. *See, e.g., Bottaro v. Hatton Associates,* 680 F.2d 895, 896-97 (2d Cir.1982) ("restrained approach" to attorney disqualification); *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1293 (2d Cir.1975); *J.P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1359-60 (2d Cir.1975) (Gurfein, J., concurring).*See also Armstrong,* 625 F.2d at 444, 446;*Matthews v. Leboeuf, Lamb, Green & McCrae,* 902 F.Supp. 26, 28 (S.D.N.Y.1995); *Metromedia Co. v. Fugazy,* 1988 WL 140773, at \*4-\*5 (S.D.N.Y. Dec. 23, 1988); *Freschi v. Grand Coal Venture,* 564 F.Supp. 414, 417 (S.D.N.Y.1983).

> FN2. The pertinent provisions of the more recently adopted ABA Model Rules of Professional Conduct (American Bar Association, 1999) are substantially the same as those found in the New York Code of Professional Responsibility. (*Compare* N.Y. DR 5-108(A), 22 N.Y.C .R.R. § 1200.24, *with* ABA Model Rule 1.9). In instances in which the New York Code and the Model Rules differ, the courts in this district appear to disagree on which should be the principal source of guidance. *Compare Bennett Silvershein Associates v. Furman,* 776 F.Supp. 800, 802-03 (S.D.N.Y.1991); *Papanicolaou v. Chase Manhattan Bank,* 720 F.Supp. 1080, 1082-84 (S.D.N.Y 1989); *Crossland Sav. FSB v. Rockwood Ins. Co.,* 700 F.Supp. 1274, 1282-83 (S.D.N.Y.1988), *with Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621, 623-25 (S.D.N.Y.1990); *Cresswell v. Sullivan & Cromwell,* 704 F.Supp. 392, 401 (S.D.N.Y.1989); *United States v. Guerrerio,* 675 F.Supp. 1430, 1432-34 (S.D.N.Y.1987).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

Page 3

> FN3. Another source of guidance is the
> ALI's *Restatement (Third) of the Law Gov-*
> *erning Lawyers,* which is still in its final
> draft but has been relied on by a number of
> courts for standards for disqualification.
> *See, e.g., Ullrich v. The Hearst Corp.,* 809
> F.Supp. 229, 234 (S.D.N.Y.1992).*Cf. Bris-*
> *tol-Myers Squibb Co. v. Rhone-Poulenc*
> *Rorer, Inc.,* 188 F.R.D. 189, 199
> (S.D.N.Y.1999).

The competing considerations to be weighed in the
balance include, on the one hand, the need to main-
tain ethical standards in the legal profession and to
avoid distortions in the substance and appearance of
the trial, and, on the other hand, to protect the litig-
ant's freedom to select counsel of his choice. *See,*
*e.g., Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d
562, 564-65 (2d Cir.1973); *Waterbury Garment*
*Corp. v. Strata Prods. Inc.,* 554 F.Supp. 63, 66
(S.D.N.Y.1982). In addressing these concerns, the
Second Circuit has repeatedly noted that disquali-
fication motions should be granted cautiously be-
cause they " 'are often interposed for tactical reas-
ons,' and ... 'even when made in the best of faith ...
inevitably cause delay." ' *Evans v. Artek Systems*
*Corp.,* 715 F.2d 788, 791-92 (2d Cir.1983) (quoting
*Board of Ed. of City of New York v. Nyquist,* 590
F.2d 1241, 1246 (2d Cir.1979)).*See, e.g., Allegaert*
*v. Perot,* 565 F.2d 246, 251 (2d Cir.1977); *Rocchi-*
*giani v. World Boxing Counsel,* 82 F.Supp.2d 182,
187 (S.D.N.Y.2000); *Szoke v. Carter,* 974 F.Supp.
360, 370 (S.D .N.Y.1997); *Bennett Silvershein,* 776
F.Supp. at 802;*United States Football League v.*
*National Football League,* 605 F.Supp. 1448,
1452-53 (S.D.N.Y.1985).*See also Richardson-Mer-*
*rell, Inc. v. Koller,* 472 U.S. 424, 436 (1985); ABA
Model Rule 1.7, Comment [15].

In looking to the rules governing an attorney's fil-
ing of a lawsuit against a present or former client,
we note that the Second Circuit has distinguished
between these two circumstances. The more com-
mon situation involves litigation handled by an at-
torney against a former client, and the applicable

standards are more liberal.

**\*3** The pertinent Code provisions-Canons 4 and
5-rest upon the recognized principle that
"[o]rdinarily an attorney may not knowingly reveal
a confidence of his client to the disadvantage of the
client."*Evans,* 715 F.2d at 791 (citing, *inter alia,*
*Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567
F.2d 225, 227 n. 2 (2d Cir.1977)).*Accord, e.g.,*
ABA Model Rule 1.6; N.Y.Code, Canon 4 & DR
4-101(B), 22 NYCRR § 1200.19(b).FN4 A corol-
lary of this rule is that if an attorney has previously
represented a client, he may not thereafter represent
an adverse party in a matter in which the confid-
ences he formerly received from the original client
may be used to the disadvantage of that client. *See*
N.Y. DR 5-108(A), 22 NYCRR § 1200.27(a); ABA
Model Rule 1.9; *Restatement* § 213(2) & Comment
(a) (Proposed Final Draft No. 1) (Mar. 29, 1996).
As distilled by the Second Circuit:

> FN4. The limited exceptions to this prin-
> ciple come into play when the client ac-
> cuses the attorney of wrongdoing, when
> the attorney seeks to collect unpaid fees or
> when a non-client charges the attorney
> with misconduct in the course of his rep-
> resentation of the client. *See, e.g., First*
> *Federal Sav. & Loan Ass'n of Pittsburgh v.*
> *Openheim, Appel, Dixon & Co.,* 110
> F.R.D. 557, 560-62 (S.D.N.Y.1986) (citing
> cases).

an attorney may be disqualified from representing a
client in a particular case if

(1) the moving party is a former client of the ad-
verse party's counsel;

(2) there is a substantial relationship between the
subject matter of the counsel's prior representation
of the moving party and the issues in the present
lawsuit; and

(3) the attorney whose disqualification is sought
had access to, or was likely to have had access to,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

Page 4

relevant privileged information in the course of his prior representation of the client.

*Evans,* 715 F.2d at 791 (citing, *inter alia, Cheng v. GAF Corp.,* 631 F.2d 1052, 1055-56 (2d Cir.1980), *vac. on other gds.,*450 U.S. 903 (1981)).*Accord, e.g., United States v. DiTommaso,* 817 F.2d 201, 219 (2d Cir.1987).[FN5]

> FN5. The "substantial relationship" test was apparently first articulated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.1953).*See Restatement* § 213, Reporter's Note, Comment d(iii) (Proposed Final Draft No. 1). Following its adoption by the Second Circuit, it has been embodied in the 1990 version of the Disciplinary Rules adopted by the four departments of the Appellate Division for application in the New York courts, *see*DR 5-108(A)(1), 22 N.Y.C.R.R. § 1200.27, as well as in the ALI's draft Restatement provisions.

Despite the substantial policy concerns underlying this principle, the Second Circuit has emphasized that arguments for disqualification on this basis are to be treated with caution, both because "we must be solicitous of a client's right freely to choose his counsel ...,"*Evans,* 715 F.2d at 791 (quoting *Government of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir.1978)), and because of the disruptive effect of such motions. *See id.* at 791-92 (quoting *Nyquist,* 590 F.2d at 1246). Accordingly, the court has emphasized that the moving party bears "a heavy burden" and must meet "a high standard of proof" to succeed on such a motion. *Id.* at 794, 791 (quoting *Government of India,* 569 F.2d at 739);*Bennett Silvershein,* 776 F.Supp. at 802;*Twin Laboratories, Inc. v. Weider Health & Fitness,* 1989 WL 49368, at *4 (S.D.N.Y. May 4, 1989). Thus, to justify disqualification, the movant must demonstrate a likelihood that the trial will be tainted. *See, e.g., Nyquist,* 590 F.2d at 1246-47.

An attorney's obligation to a current client is more

stringent. The extent and limits of that obligation are suggested by the Second Circuit's decision in *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir.1976). The court there affirmed the disqualification of the plaintiff's attorney because, when he filed the lawsuit for Cinema 5 against defendant Cinerama, he was representing Cinerama in separate litigation. In reaching this conclusion, the court held that the propriety of an attorney's conduct in suing a current client "must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients."*Id.* at 1386.In substance, then, the court rejected the notion that such action should be judged by the same standard as applied to an attorney's filing of litigation against a former client, that is, the substantial-relationship test. *Id.* at 1387.

*4 Noting the fiduciary nature of the attorney's relationship to his client, the courts observed that when Cinerama retained the lawyer to file suit on its behalf, "it was entitled to feel that at least until that litigation was at an end, it had his undivided loyalty as its advocate and champion."*Id.* at 1386 (citing *Grievance Comm. v. Rottner,* 152 Conn. 59, 65, 203 A.2d 82, 84 (1964)). This obligation encompassed the client's right to demand that the lawyer "would 'accept no retainer to do anything that might be adverse to his client's interests." ' *Id.* at 1386 (quoting *Loew v. Gillespie,* 90 Misc. 616, 619, 153 N.Y.S. 830, 832 (1915), *aff'd,*173 AD 889, 157 N.Y.S. 1133 (1st Dep't 1916)).

In upholding the disqualification of the attorney and his firm in that case, however, the court declined to hold that disqualification in such circumstances is automatic. Indeed, it appeared explicitly to recognize that the client could waive such a conflict, observing: "Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned."*Id.* at 1386.Moreover, it even declined to decide "[w]hether such adverse representation,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 5

without more, requires disqualification in every case."*Id.* at 1387.Rather, it held that where the representation of the original client is "a continuing one, adverse representation is prima facie improper, ... and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation."*Id.* (emphasis in original).

## 2. *Assessment of Plaintiff's Motion*

Plaintiff's central argument for disqualification is premised on two contentions. First, it claims that Steven Leber is a current client of Herrick, Feinstein. Second, it argues that, under the circumstances, disqualification must follow even though the plaintiff is not Mr. Leber, but rather a corporation of which he is the principal shareholder.

Neither contention is sustainable. Mr. Leber is a former, not current, client of Herrick, Feinstein. Thus, even if he were a party to this lawsuit, disqualification would be inappropriate since he has not shown a substantial relationship between the issues in this lawsuit and the subject matter of the prior representation. In addition, the plaintiff in this action, Leber Associates, was never a client of the firm. Disqualification, therefore, cannot be granted on the basis of prior representation.

At the evidentiary hearing, Mr. Leber testified in very general terms that he considered himself to be a current client because he purportedly spoke to Mr. Herman from time to time, and supposedly asked for legal advice. The credible evidence, however, is to the contrary. Mr. Herman testified that he had performed no legal services for Mr. Leber since December 1997. His recollection was corroborated by the firm's records, which reflect no charges to Mr. Leber after that time, a lapse that coincides with the completion of the discrete legal tasks that the firm had performed for him. Moreover, although Mr. Leber claimed to have spoken to Mr. Herman in recent months by telephone, the attorney credibly testified that the conversation not only was

brief, but involved no request for the performance of legal services, a characterization that explained why he never made a time entry for the phone call.FN6

> FN6. According to Mr. Herman, a firm policy of Herrick, Feinstein requires that any discussion with a client, no matter how short, must be recorded if it involved a legal matter.

**\*5** Although plaintiff correctly points out that a will and living trust are continuing legal products that may be amended from time to time, the services performed by an attorney in preparing a will and setting up a trust are finite tasks. Since there is no credible evidence in this case that Mr. Leber returned to the firm for additional work on these or any other legal matters, the record reflects that the attorney-client relationship ended years ago.

Under these circumstances, even if Leber Associates were deemed a client of Herrick, Feinstein by virtue of Mr. Leber's relationship with the firm, disqualification must be denied unless the matters on which the firm performed services for Mr. Leber were substantially related to the issues in this case. Plaintiff has not made such a showing.

The requirement that there be "a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit" is strictly enforced. In deference to the concerns already noted about the potential disruption occasioned by disqualification motions and the desire to honor a client's choice of counsel if possible, the Second Circuit has observed that disqualification will be granted-assuming the other *Evans* criteria are met-"only when the issues [in the two matters are] 'identical' or 'essentially the same .'' ' *Government of India,* 569 F.2d at 740 (citing *NCK Organization, Ltd. v. Bregman,* 542 F.2d 128, 135-36 (2d Cir.1976) (Mansfield, J., concurring); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Emle Indus.,* 478 F.2d at 572;*Motor Mart, Inc. v. Saab Motors. Inc.,* 359 F.Supp. 156,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

Page 6

158 (S.D.N.Y.1973)). The courts in this circuit continue to adhere to that stringent standard. *See, e.g., Bennett Silvershein,* 776 F.Supp. at 803-04;*Vestron, Inc. v. National Geographical Society,* 750 F.Supp. 586, 595 (S.D.N.Y.1990); *Metromedia Co.,* 1988 WL 14073, at *2 n. 3;*Waterbury Garment Co.,* 554 F.Supp. at 67.[FN7]

> FN7. As for the related requirement that the movant show that the targeted attorney received or "was likely to have had access to relevant privileged information," generally the Second Circuit recognizes a presumption of such access and trial taint if the two matters are in fact substantially related. *See, e.g., Cheng,* 631 F.2d at 1056;*Lemelson v. Synergistics Research Corp.,* 504 F.Supp. 1164, 1167 (S.D.N.Y.1981). This presumption serves to avoid the necessity that the movant choose between revealing its confidences and foregoing the disqualification motion. *See, e.g., Cheng,* 631 F.2d at 1056;*Ullrich,* 809 F.Supp. at 234;*United States Football League,* 605 F.Supp. at 1461. Nevertheless, the presumption is rebuttable. *See, e.g., Klein v. Churchill Coal Corp.,* 612 F.Supp. 247, 249-50 (S.D.N.Y.1985); *see also Lemelson,* 504 F.Supp. at 1167 (citing *Government of India,* 569 F.2d at 741 (Mansfield, J., concurring)).

The significance of the *Evans* requirements is that they ensure that disqualification will not be ordered-even of an attorney who previously represented the movant-unless the failure to disqualify him would "taint" the trial, most commonly by permitting counsel to use against his former client the very confidences entrusted to him by that client. If the issues in the two cases are substantially the same, it is fair to assume that the original client will have disclosed to his attorney confidential information that could be useful to the client's adversary in the subsequent proceeding. If the two cases are not so intimately related, however, the court declines to

indulge such an assumption, and accordingly, under *Nyquist,* disqualification would be inappropriate. *See*590 F.2d at 1246-47 (emphasizing that disqualification for conflict of interest or other unethical conduct should be imposed only if the trial will otherwise be tainted).*Accord, e.g., Evans,* 715 F.2d at 791.

*6 The "substantial relationship" test requires the court to "look with 'painstaking' care at the facts" in order to "maintain[ ] a balance between a party's right to preferred counsel and the need to 'preserve the integrity of the adversarial process." ' *Bennett Sivershein,* 776 F.Supp. at 803 (quoting *United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955); *Nyquist,* 590 F.2d at 1246). The principal focus must be the degree of overlap between the factual and legal issues raised in the two matters, an analysis that will shed light on the likelihood that the former client disclosed confidential information to the attorney that may be useful to him in representing his new client. *See, e.g., id.* at 804 (citing cases). As the draft Restatement helpfully summarizes, the "substantial relationship" test requires the court to

focus[ ] upon the general features of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation. The inquiry into the issues involved in the prior representation should be as specific as possible without thereby revealing the confidential client information itself or confidential information concerning the second client.

*Restatement* § 213, Reporter's Note, Comment d(iii) (Proposed Final Draft No. 1).*See also In re American Airlines, Inc.,* 972 F.2d 605, 614 (5th Cir.1992), *cert. denied,*507 U.S. 912 (1993) (movant must " 'delineate [ ] with specificity the subject matters, issues and causes of action' common to prior and current representations and the court engages in a 'painstaking analysis of the facts and precise application of precedent." ' (quoting *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

Page 7

1029 (5th Cir.), *cert. denied,*454 U.S. 895 (1981) (internal citations omitted)).

In this case there is no basis to suggest that the is-sues presented by the claims and defenses in the lawsuit are identical or substantially similar to the issues involved in the work performed by Herrick, Feinstein for Mr. Leber. As noted, the parties are contesting their respective shares of revenues gen-erated by a concert promoted and held in 1999, whereas the law firm's work for Mr. Leber involved the drafting of a will, the creation of a living trust for him and consultation with him on some of his financial affairs during a period that ended well be-fore the events at issue in the lawsuit.

In seeking to overcome this hurdle, plaintiff-or, more precisely, Mr. Leber-suggests that his person-al finances may become relevant to the lawsuit, but he fails to make any meaningful showing that this is the case. Mr. Leber principally points to the fact that the answer of CEI and FGP makes reference to him personally (*see* Leber Aff. at ¶ 10 & Ex. C at ¶ 33), and he further notes that at an earlier point in the litigation the defendants had made the sugges-tion that they might seek to assert a claim directly against him. (*See* Leber Aff. at ¶ 11).

*7 These arguments are unpersuasive for several reasons. First, plaintiff makes no showing whatever that the references to Mr. Leber in the defendants' pleading foreshadow any examination of matters that were the subject of legal work by Herrick, Feinstein. Indeed, the allegations in question appear to refer either to actions undertaken by Mr. Leber in 1999 in connection with the arrangements for the Bocelli concert or to his role in directly controlling Leber Associates. The services provided by the law firm bore no relationship to either matter. Leber's involvement with the concert began almost two years after the law firm had completed its last labors for him, and the creation of Leber Asso-ciates, as well as Leber's actions in running that en-tity, also occurred long after the firm had ceased performing legal services for Leber.

Second, although the defendants had earlier men-tioned the possibility of suing Mr. Leber personally on their counterclaim, no such step was ever taken. Indeed, the court ruled that any amendment of this sort would be untimely. (Order dated June 13, 2001 at ¶ 2, as amended by Endorsed Order dated July 23, 2001). Thus Mr. Leber is not, and will not be, a party to this lawsuit.

We also note that Mr. Leber's status as a non-party offers a separate reason for rejecting plaintiff's mo-tion. Even if Mr. Leber were a current client of the firm, that would not dictate disqualification. Mr. Leber is not a party to the litigation, and thus the firm's appearance on behalf of two of the defend-ants could not be characterized as a presumptive vi-olation of its fiduciary responsibilities to a client. *See, e.g., Flower Cart, Inc. v. Fackovec,* 163 A.D.2d 184, 186-87, 559 N.Y.S.2d 292, 294-95 (1st Dep't 1990). Thus, disqualification would, in any event, turn on whether plaintiff could demonstrate the likelihood that the firm's role as counsel for two of the defendants would taint the trial, and since we have already concluded that it would not even if Mr. Leber were a party, it follows that no potential for taint can be discerned on the current record.

Finally, we note that several of the cited decisions refer to Canon 9, which prohibits conduct by an at-torney that creates an appearance of impropriety. *See, e.g., Fund of Funds,* 567 F.2d at 232-33. If plaintiff intends to suggest that disqualification is independently justified by this Canon, we reject that contention. As one court has aptly noted:

If the only "appearance of impropriety" is a viola-tion of Canon 4 that has already been found devoid of substance, it would be downright perverse to hold that what has been held not to exist nonethe-less "appears". In fact, the "question begging" nature of the term "appearance of impropriety," *Model Rule of Professional Conduct* Rule 1.9, has resulted in the Model Rules's com-plete elimination of any such proscription. There-fore, Canon 9"should not be used promiscuously as a convenient tool for disqualification when the facts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

simply do not fit within the rubric of other specific ethical and disciplinary rules."*International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir.1975)....Canon 9 does not confer a roving moral commission to disqualify attorneys based on conduct specifically treated in other Canons.

**\*8** *Bennett Silvershein,* 776 F.Supp. at 806. This analysis is entirely consistent with the oft-cited observation of the Second Circuit in *Nyquist* that, absent a showing that the trial will be tainted, "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest of cases ."590 F.2d at 1247. *Accord, e.g., id.*(Mansfield, J., concurring); *Planning & Control, Inc. v. MTS Group, Inc.,* 1992 WL 51569, \*4 (S.D.N.Y. March 11, 1992). This is not that "rarest of cases."

### CONCLUSION

For the reasons stated, the plaintiff's motion to disqualify the law firm of Herrick, Feinstein is denied.

S.D.N.Y.,2001.
Leber Associates, LLC v. Entertainment Group Fund, Inc
Not Reported in F.Supp.2d, 2001 WL 1568780 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

Page 1

**C**

Regal Marketing Inc. v. Sonny & Son Produce Corp.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
REGAL MARKETING INC., Plaintiff,

v.

SONNY & SON PRODUCE CORP.; and William
W. Booth III, Defendants.
**No. 01 Civ.1911(WK).**

Aug. 1, 2002.

**Background:** Produce seller sued buyer to enforce
Department of Agriculture default order under Per-
ishable Agricultural Commodities Act (PACA).
Buyer moved for disqualification of seller's attor-
ney.

**Holdings:** The District Court, Knapp, Senior Dis-
trict Judge, held that:

(1) seller's attorney's "of counsel" relationship with
firm that had formerly represented buyer was too
attenuated to warrant disqualification by imputa-
tion, and

(2) "substantial relationship" criterion for disquali-
fication was unmet since previous representation of
buyer had been in relation to regulatory matters.

Motion denied.

West Headnotes

**[1] Attorney and Client 45 ☞21.15**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k21.15 k. Partners and Associates.
Most Cited Cases
Under New York law, attorney for seller who was
plaintiff in action against buyer to enforce adminis-
trative default order under Perishable Agricultural

Commodities Act (PACA) was not subject to dis-
qualification by imputation on basis of his "of
counsel" affiliation with law firm that had formerly
represented buyer, where relationship between at-
torney and firm was attenuated; attorney was not
member or associate in firm, his name did not ap-
pear on firm's letterhead, he was not included on
firm's professional liability insurance policy, he
was partner in own firm which maintained separate
phone, fax and billing system, and he handled only
a few cases a year in "of counsel" capacity. 7
U.S.C.A. § 499a et seq.; N.Y.C.C.R. § 1200.24(d),
1200.27(a).

**[2] Attorney and Client 45 ☞21.15**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k21.15 k. Partners and Associates.
Most Cited Cases
"Substantial relationship" criterion for disqualifica-
tion of plaintiff's attorney, in action to enforce ad-
ministrative default order under Perishable Agricul-
tural Commodities Act (PACA), was unmet under
New York law; plaintiff's attorney was associated
with firm that had formerly assisted defendant and
related company with regulatory compliance, spe-
cifically details of joint account arrangement, while
current representation involved question of whether
defendant, as opposed to related company, had pur-
chased produce from plaintiff without paying. 7
U.S.C.A. § 499a et seq.; N.Y.C.C.R. § 1200.24(d),
1200.27(a).

Robert J. Mastrogiacomo, Claffey & Mastrogiac-
omo, P.C., New York, NY, for Plaintiff.
Stephen M. Santoro, Levy, Santoro & Santoro, Car-
mel, New York, for Defendants.

*MEMORANDUM & ORDER*

KNAPP, Senior J.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

Page 2

*1 On March 7, 2001, Plaintiff Regal Marketing, Inc. (hereinafter the "Plaintiff") brought this action against Defendants Sonny & Son Produce Corp. (hereinafter "Sonny & Son Produce") and William Booth (hereinafter "Booth") (collectively the "Defendants") under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a *et seq.,* in order to recover damages against the Defendants for their purported failure to pay the Plaintiff for various shipments of produce. The Defendants now move to disqualify the Plaintiff's attorney, Robert Mastrogiacomo, and any law firm with which he is associated from representing the Plaintiff in this litiga- tion.

For the reasons set forth below, we DENY the motion for disqualification.

## BACKGROUND

### I. The Underlying Lawsuit

The Plaintiff is a corporation engaged in the business of buying and selling wholesale quantities of fresh fruits and vegetables. The company asserts that, over the course of seventeen transactions between June 27, 2000, and August 7, 2000, it sold, *inter alia,* pears, tomatoes, kiwis, and grapes to Sonny & Son Produce in the aggregate amount of $48,589.50. That produce was shipped to a warehouse in the Hunts Point Terminal Market (hereinafter the "Market") in the Bronx and, according to the Plaintiff, delivered to and accepted by Sonny & Son Produce without objection. When Sonny & Son Produce failed, in large measure, to pay for these shipments, the Plaintiff filed a complaint with the Secretary of Agriculture seeking reparations in the amount of $47,830.50 pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.*

Sonny & Son Produce failed to answer or otherwise object to that complaint and a judicial officer acting on behalf of the Secretary of Agriculture entered a default order against the company. In that order, the judicial officer concluded that Sonny & Son Produce had violated the PACA and directed the company to pay the Plaintiff, as reparations, $47,830.50 plus 10% interest as well as the $300 filing fee which the Plaintiff paid to file its complaint. After Sonny & Sonny Produce failed to pay the reparations award, the Plaintiff brought this action to, among other things, enforce that award against the Defendants.

The Defendants contend that Sonny & Son Produce never ordered these shipments from the Plaintiff and never accepted the delivery of any such produce from the Plaintiff. According to the Defendants, the Plaintiff was actually engaging in various transactions with another business known as Sonny Specialties Corp. (hereinafter "Sonny Specialties").

In August 2001, the Plaintiff moved for summary judgment on all of its causes of action against the Defendants. While that motion was still pending, the Defendant moved to disqualify the Plaintiff's attorney, Robert Mastrogiacomo, and any firm with which he is associated from representing the Plaintiff in this litigation. The Defendants specifically seek to disqualify Robert Mastrogiacomo because of his relationship with the law firm of Gentile & Dickler.

### II. Gentile & Dickler's Prior Relationship With The Defendants

*2 On or around February 23, 2000, Sonny & Son Produce, Booth, and Sonny Specialties retained Paul Gentile ("Gentile") of the law firm of Gentile & Dickler to assist them in complying with various directives of the City of New York (hereinafter the "City"). Although the record presented to us by the parties with respect to the subject matter of that representation can, at best, be described as minimal, this representation apparently involved questions about whether Sonny & Son Produce, Booth, and Sonny Specialties needed to disclose the details of Sonny Specialties' relationship with Sonny & Son Produce to the City's Department of Business Ser-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

Page 3

vices and to the Market in order to comply with directives pertaining to the registration of joint account arrangements.

In a letter to the Department of Business Services dated February 23, 2000, Gentile explained that Sonny & Son Produce's operation at the Market warranted the disclosure of its joint account arrangement with Sonny Specialties. Accordingly, on March 8, 2000, Gentile followed up with a second letter to the Department of Business Services in order to provide the necessary disclosure. In that second letter, Gentile informed the Department of Business Services that Sonny Specialties, a corporation which had been formed by Andrew Persichetti in 1998 and held its own PACA license from the United States Department of Agriculture, had entered into a joint account arrangement with Sonny & Son Produce. He was further able to inform the Department of Business Services that this "joint deal" eventually relocated to the same unit in the Market and that Sonny Specialties evolved into a "d/b/a" for Sonny & Son Produce. At the close of this disclosure letter, Gentile also commented upon Booth's corporate relationship with Sonny Specialties, for he explained that Booth had acquired a 60% interest in Sonny Specialties in order to effectuate the foregoing arrangement.

In late July 2000, Gentile provided further assistance to Sonny & Son Produce when he submitted a particular request on its behalf to the United States Department of Agriculture. In this regard, Gentile asked the Department of Agriculture to amend Sonny & Son Produce's PACA license to include an additional trade name (i.e. in effect, to add the name "Sonny Specialties Corp." to Sonny & Son Produce's license). The Department of Agriculture denied that request in a letter dated August 21, 2000. In reviewing its records, the department discovered that it had already issued a PACA license to a corporation known as Sonny Specialties in 1998 (i.e. the very company which the Defendants now aver is the entity responsible for the Plaintiff's produce shipments). At the time Gentile submitted

this request on behalf of Sonny & Son Produce, the Department of Agriculture's records indicated that Sonny Specialties' license remained current and valid. As there had been no indication in the request that Sonny Specialties would be dissolved as a corporation or that it would relinquish its independent PACA license, the Department of Agriculture refused to allow Sonny & Son Produce to add the trade name "Sonny Specialties Corp." to its own PACA license because, *inter alia,* Sonny & Son Produce's use of such a trade name might be deceptive, misleading, or confusing. Nothing in the record suggests that Gentile continued to represent the Defendants after the Department of Agriculture issued the foregoing decision.

III. Robert Mastrogiacomo's Involvement With Gentile & Dickler

*3 Nearly seven months thereafter, the Plaintiff initiated this lawsuit to recover damages for Sonny & Son Produce's failure to pay for various shipments of produce it had allegedly purchased and accepted between June 2000 and August 2000. The Plaintiff's Complaint was signed by Robert Mastrogiacomo ("Mastrogiacomo") under a caption which read:

Gentile & Dickler

Attorneys for Plaintiff

Regal Marketing

Compl. at 16. In addition, the caption in the left hand corner of the first page of the Complaint read as follows:
Gentile & Dickler (RJM 9756)

Attorneys for Plaintiff

15 Maiden Lane

New York, N.Y. 10038 FN1

FN1. The caption also provided a tele-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 7:08-cv-03252-WCC    Document 18    Filed 08/22/2008    Page 32 of Page 4 of 11

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

Page 4

phone number by which the law firm of Gentile & Dickler could be contacted.

Compl. at 1. When the Defendants subsequently responded to the Plaintiff's lawsuit with counterclaims, the reply to those counterclaims was also signed by Mastrogiacomo with similar captions on the first and last pages of that reply. *See* Reply to Counterclaims at 1, 8.

Mastrogiacomo is a partner in his own law firm, Claffey & Mastrogiacomo, P.C., which has existed since at least 1994. In contrast, according to both Mastrogiacomo and Gentile, Mastrogiacomo is not now, nor has he ever been, a member or associate of the law firm of Gentile & Dickler. Indeed, no attorneys from Claffey & Mastrogiacomo appear on the letterhead of Gentile & Dickler and vice versa. Both law firms also maintain separate phone, fax, and billing systems and have separate professional liability insurance (with no member from either firm appearing on the other's insurance policy). Moreover, neither Mastrogiacomo nor anyone else at the law firm of Claffey & Mastrogiacomo had been involved with or assisted Gentile in previously representing Sonny & Son Produce, Sonny Specialties, or Booth before the Department of Business Services in February and March 2000 or before the Department of Agriculture in July and August 2000.

Both Gentile & Dickler and Claffey & Mastrogiacomo lease space on the same floor in the same building in New York City. From time to time, Mastrogiacomo and his law firm have been associated with Gentile & Dickler in an "of counsel" capacity. Whether or not Mastrogiacomo decides to assist Gentile & Dickler with a particular case in such a capacity is apparently a question left to his own discretion. However, Mastrogiacomo assists Gentile & Dickler with relatively few cases a year in an "of counsel" capacity.

On March 2, 2001, Gentile approached Mastrogiacomo and asked him to review the Plaintiff's file and act as "of counsel" to Gentile & Dickler in the

Plaintiff's lawsuit against the Defendants. Gentile sought Mastrogiacomo's help because of Mastrogiacomo's experience in handing matters brought under the PACA. Mastrogiacomo agreed to assist Gentile & Dickler with the case in an "of counsel" capacity. It was in this capacity that he filed the Complaint and, subsequently, the Reply to the Defendants' Counterclaims described above.

On July 26, 2001, we held a conference in this case. According to the signatures on the appearance sheet, Mastrogiacomo appeared for the Plaintiff on behalf of Gentile & Dickler. At the conference, the Defendants' attorney objected to Gentile & Dickler's role in this lawsuit. In response, Mastrogiacomo suggested that, although he was currently acting in an "of counsel" capacity to Gentile & Dickler in this lawsuit, his own law firm, Claffey & Mastrogiacomo, should, by way of a substitution of attorneys, replace Gentile & Dickler as counsel for the Plaintiff. According to Mastrogiacomo, he made this suggestion in an effort to avoid a time consuming and costly motion for disqualification. At that time, we directed the Plaintiff to file a consent to change attorneys whereby Claffey & Mastrogiacomo would replace Gentile & Dickler as the Plaintiff's counsel. We informed the Defendants' attorney that once that substitution had been made, the Defendants could formally move, if they so wished, to disqualify Mastrogiacomo.

\*4 Thereafter, the Plaintiff filed the relevant consent form and we approved the change of attorneys on February 26, 2002. Nearly two months thereafter, just before we were scheduled to hear oral arguments on the Plaintiff's motion for summary judgment, the Defendants moved to disqualify Mastrogiacomo and any firm with which he is associated from representing the Plaintiff in this litigation on the basis of his affiliation with the law firm of Gentile & Dickler.

### DISCUSSION

Motions to disqualify opposing counsel are viewed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

with disfavor in this Circuit. *Clark v. Bank of New York* (S.D.N.Y.1992) 801 F.Supp. 1182, 1197. This disfavor "derives from the fact that disqualification has an immediate adverse effect on the client by separating him from the counsel of his choice, and that disqualification motions are often interposed for tactical reasons."*Bd. of Ed. of the City of New York v. Nyquist* (2d Cir.1979) 590 F.2d 1241, 1246. *See also**Mitchell v. Metro. Life Ins. Co., Inc.* (S.D.N.Y. Mar. 21, 2002) No. 01 Civ. 2112(WHP), 2002 WL 441194, *3 ("The Court of Appeals [for the Second Circuit] has cautioned that motions to disqualify counsel are not to be granted indiscriminately because they interfere with a party's right freely to choose counsel and may be interposed for tactical reasons"). Accordingly, the party seeking disqualification must meet a "high standard of proof" before a lawyer is disqualified. *Evans v. Artek Sys. Corp.* (2d Cir.1983) 715 F.2d 788, 791. *See also**Gov't of India v. Cook Indus., Inc.* (2d Cir.1978) 569 F.2d 737, 739;*In re Maritima Aragua, S.A.* (S.D.N.Y.1994) 847 F.Supp. 1177, 1180.

The disqualification of an attorney is a matter subject to our sound discretion. *See**Cresswell v. Sullivan & Cromwell* (2d Cir.1990) 922 F.2d 60, 72. "In making this determination, federal district courts in New York consult the ABA Model Rules of Professional Conduct (Model Rules), the ABA Model Code of Professional Responsibility (Model Code) and the New York Code of Professional Responsibility (New York Code). While these rules are not binding, courts look to them for guidance in regulating the professional conduct of attorneys appearing before them."*Blue Cross and Blue Shield of New Jersey v. Phillip Morris, Inc.* (E.D.N.Y.1999) 53 F.Supp.2d 338, 342. *See also**GPA Inc. v. Liggett Group, Inc.* (S.D.N.Y. Nov. 4, 1994) No. 94 Civ. 5735(AGS), 1994 WL 613267, *1 n. 1;*Brooks v. Knowledge Eng'g, Inc.* (S.D.N.Y. April 7, 1994) No. 89 Civ. 4478(SS), 1994 WL 121851, *2.

In this instance, the Defendants rest their motion to disqualify Mastrogiacomo on Cannon 5 of the New

York Code of Professional Responsibility (hereinafter "the New York Code") as well as on Disciplinary Rule 5-108, 22 N.Y.C.R.R. § 1200.27.FN2Canon 5 of the New York Code provides that a lawyer should exercise independent professional judgment on behalf of a client. N.Y. JUD. LAW, APPENDIX, CANON 5 (1992); *World Food Systems, Inc. v. Bid Holdings, Ltd.* (S.D.N.Y. Mar. 12, 2001) No. 98 Civ. 8515(VM) (KNF), 2001 WL 246372, *1;*Witorsch v. Notaris* (S.D.N.Y. Aug. 25, 1997) No. 95 Civ. 9163(JFK), 1997 WL 529016, *6. A corollary of this canon is that where an attorney has previously represented a client, he may not thereafter represent an adverse party in a matter in which the confidences he formerly received from the original client may be used to the disadvantage of that client. *See**Leber Associates, LLC v. The Entertainment Group Fund, Inc.* (S.D .N.Y. Dec. 7, 2001) No. 00 Civ. 3759(LTS)(MHD), 2001 WL 1568780, *3, *citing*DR 5-108(A), 22 N.Y.C.R.R. § 1200.27(a).

> FN2."The New York Code is essentially identical to the American Bar Association Model Code of Professional Responsibility promulgated in 1969 and adopted by the New York State Bar Association in 1979."*Leber Associates, LLC v. The Entertainment Group Fund, Inc.* (S.D.N.Y. Dec. 7, 2001) No. 00 Civ. 3759(LTS) (MHD), 2001 WL 1568780, *2 n. 1. The Second Circuit has recognized that the New York Code prescribes appropriate guidelines for the professional conduct of the Bar, and this district requires attorneys to adhere to the New York Code. *Song v. Dreamtouch, Inc.* (S.D.N.Y. May 8, 2001) No. 01 Civ. 0386(AGS), 2001 WL 487413, *4.

*5 To ensure faithful adherence to such principles, an attorney may be disqualified in a particular case if:

(1) the moving party is a former client of the adverse party's counsel;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans,* 715 F.2d at 791. *See also*Leber Associates, *LLC,* 2001 WL 1568780 at \*3. With these considerations in mind, we turn to the question of whether the Defendants have satisfied the applicable standard.

I. The "Of Counsel" Relationship And Disqualification By Imputation

[1] Ordinarily, the parties moving for disqualification must first establish that they were once clients of the attorney they are now seeking to disqualify. *See*Clark, 801 F.Supp. at 1197;*Bennet Silvershein Associates v. Furman* (S.D.N.Y.1991) 776 F.Supp. 800, 803. However, in this instance, Mastrogiacomo never personally represented either Sonny & Son Produce or Booth. *See* Gentile Aff. ¶ 6, Mastrogiacomo Aff. ¶¶ 17-18. Nonetheless, the Defendants are indisputably former clients of Gentile, who is a partner in the law firm of Gentile & Dickler. *See* Booth Aff., Ex. A, B; Gentile Aff. ¶¶ 1, 3-4. Although Mastrogiacomo is not a member of the law firm of Gentile & Dickler, *see* Mastrogiacomo Aff. ¶ 4, Gentile Aff. ¶ 7, he has, from time to time, handled cases in an "of counsel" capacity for that firm. *See* Gentile Aff. ¶ 10; Mastrogiacomo Aff. ¶¶ 3, 19, 33; July 18, 2002 Tr. at 7. Accordingly, the Defendants now seek to disqualify Mastrogiacomo on the basis of his "of counsel" affiliation with their former attorney.

Under the New York Code, "where an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are like-

wise precluded from such representation."*Kasis v. Teacher's Ins. and Annuity Ass'n* (N.Y.1999) 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674. *See also*22 N.Y.C.R.R. § 1200.24(d) (creating a rebuttable presumption that a lawyer's personal conflict of interest is imputed to his firm). On occasion, New York courts have held that disqualification may be necessary where an attorney and a law firm share an "of counsel" relationship. *See*Cardinale v. Golinello (N.Y.1977) 43 N.Y.2d 288, 296-297, 401 N.Y.S.2d 191, 372 N.E.2d 26;*Nemet v. Nemet* (N.Y.App.Div.1985) 112 A.D.2d 359, 491 N.Y.S.2d 810, 811. *See also* N.Y. State Bar Ass'n Comm. on Professional Ethics, Opinion No. 615 n. 1 (January 29, 1991) ("A lawyer who is 'of counsel' to a law firm is 'associated' with the members and associates of the firm for the purposes of DR 5-105(D)"); N.Y.C. Bar Ass'n Comm. on Professional and Judicial Ethics, Formal Op. No.1995-8 (May 31, 1995) ("If the 'of counsel' designation is employed, the attorneys will need to keep in mind that for purposes of analyzing conflicts of interest, 'of counsel' relationships are treated as if the 'counsel' and the firm are one unit").

\*6 Nevertheless, New York federal and state courts have also, on occasion, refused to disqualify an attorney or a law firm on the grounds of their "of counsel" or "special counsel" relationships. *See*Renz v. Beeman (N.D.N.Y. Feb. 21, 1989) No. 87 CV 487, 1989 WL 16062, \*6-\*7; *Rosman v. Shapiro* (S.D.N.Y.1987) 653 F.Supp. 1441, 1442, 1447;*Bison Plumbing City, Inc. v. Benderson* (N.Y.App.Div.2001) 281 A.D.2d 955, 722 N.Y.S.2d 660, 661,*citing*Gray v. Memorial Med. *Ctr.* (S.D.Ga.1994) 855 F.Supp. 377, 379-380;[FN3]*Shelton v. Shelton* (N.Y.App.Div.1989) 542 N.Y.S.2d 719, 660. Those decisions are in accord with the principles articulated by the Second Circuit, which indicate that labels alone should not control a court's decision in the sensitive area of attorney disqualification. *See*Funds of Funds, Ltd. v. Arthur Anderson and Co. (2d Cir.1977) 567 F.2d 225, 235. Hence, an attenuated relationship between a lawyer and a law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

Page 7

firm will be insufficient to make the attorney a member of that firm for the purposes of an attorney disqualification motion, regardless of the attorney's "of counsel" label. *Renz,* 1989 WL 16062 at \*6-\*7. *See also Gray,* 855 F.Supp. at 379-380[FN4] (refusing to disqualify an attorney by imputation on the basis of his "of counsel" affiliation with a law firm because "the level of an individual attorney's involvement within a firm is an important factor in a decision to impute disqualification to other attorneys" and the defendants had failed to demonstrate that the attorney in question was " 'more than a *de minimus*' of counsel, an independent contractor working part time for the firm" ").[FN5]

> FN3. Although the Appellate Division of the New York Supreme Court addressed a "special counsel" relationship in *Bison Plumbing City, Inc.,see* 722 N.Y.S.2d at 661, that term is merely one among many which denotes an "of counsel" relationship. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 90-357 (May 10, 1990). Indeed, the Appellate Division in *Bison Plumbing City, Inc.* reached its decision by specifically citing to *Gray v.. Memorial Med. Ctr.* and *Shelton v. Shelton,* each of which addressed an "of counsel" relationship. *SeeGray,* 855 F.Supp. at 379-380;*Shelton v. Shelton* (N.Y.App.Div.1989) 151 A.D.2d 659, 542 N.Y.S.2d 719, 720.

> FN4. Although the court in *Gray* premised its decision on the ABA Model Rules of Professional Conduct ("Model Rules") and the Defendants herein are relying on the New York Code, that distinction, without more, does not persuade us that the standard set forth in *Gray* should not provide guidance for the case at bar. In determining whether an attorney should be disqualified, federal district courts in New York consult both the New York Code and the Model Rules for guidance. *Blue Cross and*

*Blue Shield of New Jersey,* 53 F.Supp.2d at 342. Moreover, "[t]he pertinent provisions of the ... ABA Model Rules of Professional Conduct ... are substantially the same as those found in the New York Code of Professional Responsibility."*Leber Associates, LLC,* 2001 WL 1568780 at \*2 n. 2. *Compare also*ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.10(a), *andRoberts & Schaeffer Co. v. San-Con, Inc.* (S.D.W.Va.1995) 898 F.Supp. 356, 360,*with*N.Y.C.R.R. 10027.24(d). Indeed, as discussed above, the Appellate Division of the New York Supreme Court in *Bison Plumbing City, Inc.* specifically cited to the *Gray* decision (premised on the Model Rules) in applying the relevant provisions of the New York Code. *SeeBison Plumbing City, Inc.,* 722 N.Y.S.2d at 661.

> FN5.*Cf.* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 90-357 (May 10, 1990) (recognizing that the "core characteristic properly denoted" by the title "of counsel" is "a 'close, regular, personal relationship" ' but that the "of counsel" affiliation does not refer to "a relationship involving only an individual case," "a relationship involving only occasional collaborative efforts among otherwise unrelated lawyers or firms," or "the relationship of an outside consultant"); N.Y.C. Bar Ass'n Comm. on Professional and Judicial Ethics, Formal Op. No.1996-8 (July 15, 1996) ("the accuracy of the term 'of counsel' to describe the arrangement" between the law firm and an attorney "depends on the relationship being 'close, continuing, regular and personal.' Such factors as the sharing of space and availability for consultation on a regular basis are strongly indicative of the requisite closeness of relationship ... but not conclusive absent closeness, regularity and a personal dimension in the relationship.")

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

When Mastrogiacomo's relationship with Gentile & Dickler is examined in accordance with these principles, it falls short of the type of affiliation which would justify the attribution of Gentile's conflicts of interest to Mastrogiacomo. As discussed above, Mastrogiacomo is not actually a member or associate in the law firm of Gentile & Dickler. His name does not appear on that firm's letterhead and he is not included on Gentile & Dickler's professional liability insurance policy. Moreover, Claffey & Mastrogiacomo, the law firm in which Mastrogiacomo is a partner, maintains a separate phone, fax, and billing system (as well as a separate professional liability insurance policy) than that employed by Gentile & Dickler. Claffey & Mastrogiacomo merely leases space on the same floor in the same building as Gentile & Dickler. Although Mastrogiacomo indicated, over the course of oral arguments, that he did on occasion utilize Gentile & Dickler's secretary to expedite a task, he handles only a few cases for Gentile & Dickler over the course of a year in an "of counsel" capacity. In other words, he only engages in occasional collaborative efforts with Gentile & Dickler and hence provides that firm with only sporadic assistance.

Accordingly, although the Defendants attempt to impute Gentile's conflicts of interest to Mastrogiacomo, they have not shown that Mastrogiacomo is " 'more than a *de minimus* of counsel, an independent contractor working part time for" ' Gentile & Dickler. *SeeGray,* 855 F.Supp. at 379. Since Mastrogiacomo's relationship with Gentile & Dickler is too attenuated to merit the imputation of Gentile's conflicts of interest to Mastrogiacomo, that relationship cannot justify Mastrogiacomo's disqualification on the basis of Gentile's conflicts. *Seeid.* at 380;*Renz,* 1989 WL 16062 at *7.

II. Substantial Relationship

*7 [2] Even if the Defendants could show that Mastrogiacomo's relationship with the law firm of Gentile & Dickler was sufficient to justify the imputation of Gentile's conflicts of interest to Mastrogiac-

omo, the Defendants would still be unable to secure his disqualification as they have failed to demonstrate that the subject matter of Gentile's previous representation of the Defendants is substantially related to the subject matter of this lawsuit. "[W]here the alleged conflict relates to a former client, disqualification is warranted only where there is a substantial relationship between the subject matters of the representation."*Hartford Accident and Indem. Co. v. RJR Nabisco, Inc.* (S.D.N.Y.1989) 721 F.Supp. 534, 539.FN6*See alsoIn re Maritima Aragua, S.A.,* 847 F.Supp. at 1182-1183;*Clark,* 801 F.Supp. at 1198-1199.

> FN6. The Defendants appear to suggest that the representations at issue in this motion might best be characterized as simultaneous representations rather than successive representations. According to the date stated on the complaint, Mastrogiacomo supposedly signed the complaint in the instant action on April 5, 2000, even though the action was filed on March 7, 2001. The Defendants seize on this "April 5, 2000" date to suggest that Gentile & Dickler was simultaneously representing Sonny & Son Produce as well as Booth (through Gentile's services) before the Department of Business Services in February and March 2000 (and a few months later before the Department of Agriculture) while the law firm was simultaneously representing the Plaintiff in an adverse action against the Defendants in the lawsuit here (through Mastrogiacomo's services). Were this truly a case involving simultaneous representations, a more stringent disqualification standard would apply than that otherwise applicable in circumstances involving successive representations. *SeeWaterbury Garment Corp. v. Strata Prod., Inc.* (S.D.N.Y.1982) 534 F.Supp. 63, 66 ("When the moving party is a present client of his adversary's attorney the representation is 'prima facie improper' and dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

qualification is required"); *Leber Associates, LLC,* 2001 WL 1568780 at \*3 (recognizing that "[a]n attorney's obligation to a current client is more stringent" and that this obligation should not "be judged by the same standard as applied to an attorney's filing of litigation against a former client, that is, the substantial-relationship test"); *Rosewood Apartments Corp. v. Perpignano* (S.D.N.Y. Feb. 7, 2000) No. 99 Civ. 4226(NRB)(MHD), 2000 WL 145982, \*4 (same). However, Mastrogiacomo attests that the Complaint was completed on or about March 6, 2001, and that it bore an incorrect date as a result of his office's inadvertent failure to change the date on the computer template used in preparing that complaint. *See* Mastrogiacomo Aff. ¶ 26. Although the Defendants attempt, without any evidentiary basis, to cast doubt on that explanation, the record does not support their allegations. The action at bar concerns produce shipments that were made between June 2000 and August 2000. Indeed, this action focuses in part on the enforcement of a reparations award entered by the judicial officer at the Department of Agriculture in December 2000. Hence, if the complaint herein had been signed on April 5, 2000, then the Plaintiff would have been seeking to recover reparations for shipments which had not yet been made and to enforce an award which had not yet been issued. Given these considerations, we take Mastrogiacomo's explanation at face value and will not invoke the more stringent standard applicable to simultaneous representations.

"The requirement that there be 'a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present suit' is strictly enforced."*Leber Associates, LLC,* 2001 WL 1568780 at \*5. *See alsoClark,* 801 F.Supp. at 1198;*Bennett Silvershein*

*Associates,* 776 F.Supp. at 803-804. In deference to the concerns about the possible disruption occasioned by disqualification motions and the desire to honor a client's choice of counsel if possible, the Second Circuit has observed that disqualification will be granted "only when the issues involved have been 'identical' or 'essentially the same.' ' *Gov't of India,* 569 F.2d at 740. *See alsoLeber Associates, LLC,* 2001 WL 1568780 at \*5. "The courts in this Circuit continue to adhere to that stringent standard ." *Id.See alsoIn re Maritima Aragua, S.A.,* 847 F.Supp. at 1182;*Clark,* 801 F.Supp. at 1198;*Bennett Silvershein Associates,* 776 F.Supp. at 803-804;*Waterbury Garment Corp. v. Strata Prod., Inc.* (S.D.N.Y.1982) 534 F.Supp. 63, 67. That standard requires a determination with respect to whether the facts which were necessary to the first representation are necessary to the present litigation. *SeeUnited States Football League v. National Football League* (S.D.N.Y.1985) 605 F.Supp. 1448, 1459. A substantial relationship will be established between the two representations if facts pertinent to the problems for which the original legal services were sought are relevant to the subsequent litigation. *See id.*

Here, Gentile previously assisted the Defendants with regulatory issues. In February and March 2000, he helped them comply with the directives of the City's Department of Business Services as they pertained to the registration and disclosure of joint account arrangements. *See* Booth Aff., Ex. A. In July 2000, he asked the United States Department of Agriculture to allow Sonny & Son Produce to add a trade name to its PACA license (i.e. in effect to add the trade name "Sonny Specialties Corp." to Sonny & Son Produce's license), although the department denied that request on August 21, 2000. *See* Booth Aff., Ex B. Gentile's regulatory work before the Department of Business Services focused in particular on the details of the joint account arrangement between Sonny & Son Produce and Sonny Specialties (including Booth's ownership interest in Sonny Specialties); his regulatory work before the Department of Agriculture touched upon the confusion or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

deception which would (according to the Department of Agriculture) flow from Sonny & Son Produce's use of the trade name "Sonny Specialties Corp." where that trade name was already employed on an independent license by the separately incorporated Sonny Specialties (particularly as there was no indication at the time of the request that the latter corporation would be dissolved).*See* Booth Aff., Ex. A, B. However, nothing in the record indicates that Gentile's assistance with such regulatory work touched upon either issues relating to Sonny & Son Produce's indebtedness to third parties nor upon information pertaining to the specific perishable commodities Sonny & Son Produce purchased in 2000 or the companies from which Sonny & Son Produce accepted such commodities as opposed to the companies with whom Sonny Specialties engaged in distinct business transactions.

**\*8** In sharp contrast, the instant action is concerned with this very category of information which Gentile's unrelated regulatory work did not touch upon. The Plaintiff contends that Sonny & Son Produce, and not Sonny Specialties, purchased various shipments of its produce between June and August 2000. The Defendants, however, argue that the Plaintiff has filed this action against the wrong party and that the Plaintiff was in fact doing business separately (and specifically) with Sonny Specialties and not with Sonny & Son Produce. *See* Booth Aff. ¶ 5; Santoro Aff. ¶ 10; Defs.' Mem. in supp. of Mot. to Disqualify at 1, 4. In other words, their defense here in large measure rests upon the question of which of these two supposedly distinct businesses purchased the particular produce at issue (and may therefore be liable to the Plaintiff under 7 U.S.C. § 499e and 7 U.S.C. § 499g).

Since all the parties to this lawsuit have thus steadfastly avoided implicating any joint arrangement between Sonny & Son Produce and Sonny Specialties, and have instead focused on the distinct and independent actions of each of these two businesses, the subject matter of Gentile's February/

March 2000 regulatory work on behalf of the Defendants is not substantially related to the subject matter of this lawsuit.[FN7]Moreover, as no one in this lawsuit has raised any dispute which implicates the trade name set forth on Sonny & Son Produce's PACA license or Sonny & Son Produce's failure to add the trade name "Sonny Specialties Corp." to its license, the subject matter of Gentile's July/August 2000 regulatory work on behalf of the Defendants is not substantially related to the subject matter of this lawsuit.[FN8]

> FN7. At oral arguments, it became apparent that the Defendants were concerned about the information pertaining to Booth reflected in Gentile's March 2000 letter to the Department of Business Services, particularly in light of Booth's relationship with Sonny Specialties, which the Defendants contend "is the liable party to begin with."*See* July 18, 2002 Tr. at 11-12. Their concerns stem from the Plaintiff's attempt to hold Booth personally liable under the PACA. However, such concerns have little merit here. Gentile's regulatory work before the Department of Business Services only focused on disclosures pertaining to Booth's ownership interest in Sonny Specialties, *see* Booth Aff., Ex. A, and the Plaintiff in this action is solely attempting to hold Booth liable under the PACA in accordance with his interests in Sonny & Son Produce, not as a result of any interest he may hold in Sonny Specialties.

> FN8. The Defendants appear to suggest that Gentile's regulatory work before the Department of Agriculture is related to the subject matter of this lawsuit because both the prior representation and the action here fall under the broad umbrella of the PACA. We disagree. Sonny & Son Produce's request to add a trade name to its existing PACA license implicated the Secretary of Agriculture's authority to disapprove a li-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

censee's use of an additional trade name if, in his opinion, such a use would be deceptive, misleading, or confusing to trade. *See*7 U.S.C. § 499c(c). In contrast, the claims here focus on the unrelated questions of whether the Defendants complied with the trust provisions set forth in 7 U.S.C. § 499e and whether the reparations award issued by the Department of Agriculture should be enforced pursuant to 7 U.S.C. § 499g. Given that no party here has raised a dispute with respect to Sonny & Son Produce's PACA license, we find that the mere fact that these three statutory provisions all fall within the broad scope of the PACA does not alone establish a substantial relationship between this lawsuit and Gentile's prior regulatory work on behalf of the Defendants before the Department of Agriculture.

In sum, neither the issues arising out of Gentile's prior regulatory work on behalf of the Defendants nor the information pertinent thereto are substantially related to the subject matter of the action at bar. The absence of a substantial relationship between those prior representations and the action here precludes Mastrogiacomo's disqualification on the basis of Gentile's former regulatory work on behalf of the Defendants. *SeeIn re Maritima Aragua, S.A.,* 847 F.Supp. at 1182-1183;*Clark,* 801 F.Supp. at 1198-1199.

### CONCLUSION

For the foregoing reasons, we hereby DENY the Defendants' motion for disqualification.

SO ORDERED.

S.D.N.Y.,2002.
Regal Marketing Inc. v. Sonny & Son Produce Corp.
Not Reported in F.Supp.2d, 2002 WL 1788026 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.